**IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON**

**DIVISION II**

|  |  |
|---|---|
| JESSICA WRIGLEY, individually, and as Personal Representative for the Estate of A.C.A., Deceased, and O.K.P., a minor child, and I.T.W., a minor child, by and through their biological mother, JESSICA WRIGLEY,<br><br>        Appellants/Cross-Respondents,<br><br>    v.<br><br>STATE OF WASHINGTON; DEPARTMENT OF SOCIAL & HEALTH SERVICES; DONALD WATSON & "JANE DOE" WATSON, husband and wife, individually and the marital community thereof; ALESSANDRO LAROSA & "JOHN DOE" LAROSA, husband and wife, individually and the marital community thereof; RACHEL WHITNBEY & "JOHN DOE" WHITNEY, husband and wife, individually and the marital community thereof; JENNIFER GORDER & "JOHN DOE" GORDER, husband and wife, individually and the marital community thereof; "JOHN DOE" Social Worker & "JANE DOE" Social Worker, husband and wife individually and the marital community thereof, 1 through 5,<br><br>        Respondents/Cross Appellants. | No.  49612-7-II<br><br><br>PART PUBLISHED OPINION |

BJORGEN, J. — A.A., a six year old boy, was killed by his father, Anthony Viles,

approximately three months after being placed with Viles.  A.A.'s mother, Jessica Wrigley, I.W.,

a minor child, and the Estate of A.A. (collectively the Wrigleys) appeal the trial court's grant of

partial summary judgment, which dismissed all of the Wrigleys' negligence-based claims against

the Department of Social and Health Services (DSHS)[1] relating to the death of A.A. The Wrigleys also appeal the trial court's denial of their motion for leave to amend their complaint.

The Wrigleys argue that DSHS owed A.A. a duty of care under (1) former RCW 26.44.050 (2012), (2) the shelter care order, and (3) the special relationship doctrine. The Wrigleys also argue the trial court abused its discretion when it denied their motion for leave to file an amended complaint because DSHS cannot show it would have been prejudiced by such an amendment.

On cross-appeal, DSHS argues that (1) the Wrigleys' claims fail as a matter of law based on a lack of proximate cause and (2) the trial court abused its discretion when it refused to strike opinions offered by the Wrigleys' expert.

In the published portion of this opinion, we hold that DSHS owed the Wrigleys a duty of care under former RCW 26.44.050. Consequently, we reverse the order granting DSHS's motion for partial summary judgment and dismissing the Wrigleys' claim under former RCW 26.44.050. In the unpublished portion, we decline to address the issue of duty under the shelter care order and the special relationship doctrine under RAP 9.12, because it was not called to the attention of the trial court. We also hold that the trial court abused its discretion when it denied the Wrigleys' motion to amend their complaint to add a general negligence theory. Accordingly, we reverse the dismissal of any other negligence-based claims, because the trial court should have granted the Wrigleys leave to amend their complaint.

On the cross-appeal, we do not reach the issue of proximate cause because we hold that the trial court abused its discretion when it denied the Wrigleys' motion to amend. Finally, we

---

[1] The Department of Social & Health Services (DSHS) recently changed its name to Department of Children, Youth, and Families. We refer to DSHS in this opinion because that was its name at the time this case was filed in superior court.

hold the trial court did not abuse its discretion when it refused to strike the opinions offered by the Wrigleys' expert.

We reverse and remand.

FACTS

A.      Substantive Facts

Jessica Wrigley[2] and Viles met in December 2004, and Jessica became pregnant with A.A. in February 2005. After she became pregnant, Jessica claims Viles' behavior toward her changed; for example, he became more controlling and verbally abusive. She asserts his behavior began to escalate and he began threatening and abusing her physically, even threatening to kill her several times. According to Jessica, Viles used methamphetamine, cocaine, ketamine, and heroin and abused alcohol throughout their brief relationship.

On August 26, 2005, Jessica sought a protection order, which the court granted on September 10. A.A., their son, was born on October 19. On November 7, Jessica sought renewal and modification of the protection order because Viles had been loitering outside of her home.

Viles' violent behavior and abuse of drugs and alcohol predated his relationship with Jessica and continued after their relationship ended. From 1998-2001, Viles was held in juvenile detention at various times for assaultive behavior and suicidal threats. In February 2000, Viles was taken into mental protective custody after making suicidal threats. Viles' mother, Rose Viles, informed law enforcement that Viles "ha[d] problems with his violent tendencies." Clerk's Papers (CP) at 530. Viles was again taken into mental protective custody in July 2000

---

[2] We use Jessica Wrigley's first name for clarity, as the lawsuit involves multiple plaintiffs/appellants. We intend no disrespect.

3

after he attempted suicide. In August 2000, Viles was incarcerated at the Psycho Social Rehab Center in Pocatello, Idaho, where he had to be physically restrained after assaulting an inmate. Viles "became combative and began throwing the chair around and yelling and screaming" when law enforcement confronted him. CP at 536. Then, in September 2000, Viles' mother called law enforcement due to a domestic disturbance between Viles and her.

In 2001, Viles pled guilty to battery. In 2002, he pled guilty to minor in possession and was accused of rape. The alleged victim completed a computer voice stress analysis that concluded she was being truthful; Viles would not participate in the stress test due to advice from his counsel. In June 2002, law enforcement was called to a physical altercation between Viles and his girlfriend, Jami Carranza. In October 2002, Viles' grandfather, Roy Viles,[3] reported a domestic disturbance between him and Viles.

In September 2003, law enforcement was called because of a domestic disturbance between Viles and Carranza. During the investigation, Viles admitted to pushing Carranza. After a physical altercation with law enforcement, Viles pled guilty to disturbing the peace. In May 2004, Carranza reported to law enforcement that Viles had arrived at her home intoxicated, gotten into an argument, and drove away drunk.

In October 2005, Roy reported another domestic disturbance between Viles and him. Roy reported that Viles had physically threatened him and was using drugs. In January 2006, Viles was stabbed with a screwdriver during a fight.

---

[3] We refer to Roy Viles by his first name to avoid confusion. We intend no disrespect.

In January 2007, Viles pled guilty to contributing to the delinquency of a minor when he provided alcohol to and harbored a 15 year old runaway female. Viles admitted to law enforcement he had marijuana in his home.

In January 2009, Ramon Garcia, Carranza's fiance, reported Viles breaking into a shed in his back yard. Viles was charged with unlawful entry.

In December 2011, William Viles[4] and Ashley Eskelson called law enforcement to report Viles had come to their home and threatened to "break [William's] neck."[5] CP at 586-88. This incident occurred one month before DSHS placed A.A. with Viles, described below.

Jessica married Jared Wrigley on November 30, 2007. In 2010, the Wrigleys, including A.A., moved from Idaho to Washington.

A.A.'s first contact with DSHS occurred at age five in the summer of 2011, when his Catholic Community Services individual mentor made four reports to DSHS concerning the possible abuse and neglect of A.A. by the Wrigleys. Child Protective Services (CPS) assigned the case to Kim Karu for investigation. After Karu's investigation, CPS transferred their case to Family Voluntary Services (FVS) at the end of August 2011.

On September 29, FVS employee, Rachel Whitney, made a routine health and safety visit, traveling to Jessica's home after she discovered A.A. did not attend school. After arriving at the their home, she observed A.A. shaking, his eyes tearing, his lips and mouth area appeared red, and she observed bruising on his jaw and cheek that had not been there during her visit a week earlier. Jessica explained that she had put hot pepper sauce in A.A.'s mouth, which caused

---

[4] The record does not disclose the relationship between Viles and William.

[5] Although Viles had been arrested multiple times for incidents discussed above, his last conviction for violence dated to when he was a juvenile, 11 years earlier.

the observable redness, because he called her a name. Whitney asked A.A. what happened and he said that when his mother "opened his mouth with her fingers to put in the hot sauce he screamed because it hurt so bad." CP at 139. A.A. also said that his father spanked him with his hand or belt for wetting the bed.

Whitney noted that Jessica appeared aggravated. Jessica stated to Whitney that she wanted to put A.A. up for adoption. Whitney recommended putting A.A. into a voluntary out-of-home placement for two weeks and Jessica agreed.

CPS assigned the case to Jennifer Gorder, and Gorder interviewed A.A. the next day at his school. A.A. stated that he was spanked by his father with a belt for wetting his pants. Gorder noted and photographed bruises on A.A.'s spine, side, face, and above his buttocks. Gorder noted that the bruises on A.A.'s back and forearm were linear, which indicated they may have been made with a belt.

At an October 4 family team decision meeting, Jessica informed CPS that she had a restraining order against Viles because of threats he made against her. Jessica told the social workers that Viles had threatened to cut her head off, had tried to run over her, had dragged her upstairs by her hair, and had a reputation for violence in Pocatello.

On October 5, DSHS filed a dependency petition regarding A.A., based on Gorder's investigation. The dependency petition informed the court of the restraining order between Jessica and Viles. Both A.A and his younger brother, I.W., were removed from Jessica's home.

Gorder, meanwhile, located Viles, who showed interest in having custody of A.A.[6] Viles communicated the same desire to Whitney. Gorder ran a "Purpose Code C" background check

_____

[6] It appears DSHS did not inform Viles of all of A.A.'s significant behavior issues. DSHS conveyed to Viles that A.A. "had trouble with school and he acted out a lot. That was pretty much it." CP at 731. In fact, Viles testified that "[t]hey really had no information for me." CP

on Viles through National Crime Information Center (NCIC), which requests criminal history information from the Federal Bureau of Investigation. According to Gorder, Viles' background check did not raise concern. DSHS Centralized Services Administrator, Christopher Parvin, reviewed Viles' Idaho Repository Case History. Parvin was responsible for overseeing all DSHS background check programs. Parvin asserted that none of the information, crimes, or infractions contained in Viles' case history were disqualifying under the federal Adoption and Safe Families Act of 1997, Public Law 105-89.

On October 11, Viles agreed to shelter care for A.A, and the hearing regarding Jessica was set for October 25. The shelter care hearing was continued over the next three months. During that time, Viles continued to make it known, both personally and through his attorney, that he wanted A.A. placed with him.

A.A.'s case was reassigned to CPS social worker Don Watson. Watson conducted an initial investigation regarding the placement of A.A. with Viles, calling several references Viles provided, and speaking with Viles directly.

On October 24, Watson called Jessica to obtain additional information about Viles and she told him that Viles had an extensive criminal history, had been arrested for providing alcohol to minors, had a restraining order against him, and that A.A. had never met him.

On January 25, 2012, Watson entered a note in the file that included Jessica's concerns about A.A. being placed with Viles due to his history of domestic violence.

---

at 731. Viles "assumed it was mainly throwing … temper tantrums." CP at 733. DSHS did not advise Viles that A.A. had been removed from several schools and daycare providers. DSHS did not inform Viles that the behavioral issues included concerns and diagnoses of ADHD (attention deficit hyperactivity disorder), PTSD (post-traumatic stress disorder), anxiety, pervasive development disorder, oppositional defiant disorder, autism, anger/rage concerns, depression, sleep disturbance, and enuresis.

On January 30, the court heard Viles' motion to have A.A. released from shelter care and placed with him in Idaho. Viles' attorney asserted that "[t]here was absolutely no allegations about [Viles] in the [dependency] petition. The only problem was that he hadn't had contact with the child," and Viles had been addressing that. CP at 293-94. DSHS, through an Assistant Attorney General (AAG), indicated that because A.A. was not dependent and therefore not within the Interstate Compact on the Placement of Children (ICPC), DSHS could not "make a fully informed recommendation" as to A.A.'s placement. CP at 299-300. The AAG indicated, however, that besides the lack of parenting relationship, "the Department has no other concerns." CP at 300.

The AAG and CPS social worker Watson did not provide to the court all of the background information Watson had gathered. Neither the AAG nor Watson informed the court about Viles' prior arrests or Jessica's allegations of violence and concerns regarding placement of A.A. with Viles. Jessica did not appear at the hearing. The Wrigleys' attorneys did not fully relay the concerns she had expressed to Watson to the court. They advised the court that Jessica's "separation from Mr. Viles and apparently at least some of their relationship was pretty rocky." CP at 306. They also stated that they had heard from Jessica that Viles was violent, and that she had "grave concern regarding [A.A.'s] well-being." CP at 304. In addition, the court heard testimony from A.A.'s therapist.

At the conclusion of testimony, the court ordered A.A. released from shelter care and placed with Viles "for a [30 day] visit," and allowed Viles to take A.A. home that day. CP at 203-04. The court set another hearing date for late February, directing that both Watson and A.A.'s therapist should check in on A.A. during the intervening weeks. Watson and A.A.'s

therapist checked in with A.A. several times, but there was no indication Viles had abused or neglected A.A.

When Jessica learned A.A. had been placed with Viles, she "called Mr. Watson hysterical" and reminded him again of the incidents in which Viles had been violent with her or threatened her. CP at 880. She told him that because of A.A.'s behavioral problems, if A.A. was with Viles, "he would be dead within six months." CP at 880. She stated she did not want A.A. "to be placed with Mr. Viles." CP at 238. Watson told Jessica about the upcoming February hearing date at which she could voice her concerns.

On February 21, the court held a hearing on whether A.A. should continue placement with Viles. Watson and A.A.'s therapist reported their contacts with A.A. and Viles. Jessica did not attend the hearing. Jessica's attorney suggested they were in agreement with dismissing the dependency petition, which would leave A.A. in Viles' custody. The court specifically made a finding that placement with Viles was in A.A.'s best interest and dismissed the dependency petition.

Viles beat A.A. to death eight weeks later—he was only six and half years old.

B.    Procedural Facts

The Wrigleys filed their amended complaint for damages against DSHS and others on December 16, 2014. The complaint pled wrongful death, negligent investigation, outrage, loss of consortium, negligent misrepresentation, survival action, negligent training/supervision, and publication of private facts. The complaint did not plead general common law negligence.

DSHS moved for partial summary judgment on all negligence claims. The Wrigleys responded in part by submitting a declaration by Sonja Ulrich with expert testimony on DSHS's compliance with its standard of care.

On August 5, the court provided an oral ruling on the motion. The trial court order granting in part and denying in part defendants' motion for partial summary judgment made findings of fact and conclusions of law, in part, as follows:

Based on these records, the Court finds that the following facts are not disputed:

1. Defendants removed [A.A] from the home of Jessica and Jared Wrigley based on allegations of abuse and neglect made against the Wrigleys;
2. The only allegations of abuse and neglect made under RCW 26.44 regarding [A.A.] were related to the Wrigley home;
3. There is no evidence that the investigation of the allegations related to the Wrigley home was faulty;
4. DSHS never received any report of abuse or neglect made pursuant to RCW 26.44 regarding Anthony Viles; and
5. Plaintiffs do not allege any negligence-based claims other than those that arise under RCW 26.44.050.

Based on the above undisputed facts, the Court found the following facts were disputed, but construed them in favor of the Plaintiffs for purposes of summary judgment.

1. At the January 30, 2012 placement hearing ("Placement Hearing"), DSHS offered testimony of social worker Donald Watson that only highlighted positive aspects of the potential placement of [A.A.] with Anthony Viles. Argument by DSHS's representative, Assistant Attorney General, Meghan Collins, also only highlighted positive aspects of the potential placement of [A.A.] with Anthony Viles;
2. At the Placement Hearing, DSHS took the lead in offering testimony related to [A.A.]'s potential placement with Anthony Viles;
3. DSHS had more information than it provided to the court at the Placement Hearing; and
4. Social worker Donald Watson's understanding of his authority to conduct an investigation related to [A.A.]'s placement in Anthony Viles' home evolved over time. Social worker Watson believed he did not have authority to utilize tools available via the ICPC process to conduct a more thorough investigation. Information that would have been available to Mr. Watson through a more thorough investigation include: Mr. Viles' juvenile conviction for battery, the restraining order between Jessica Wrigley and Anthony Viles, allegations regarding Anthony Viles' anger issues, and parenting assessment completed as part of custody litigation in which Anthony Viles was a party.
5. In addition, Mr. Watson did not conduct a follow-up investigation regarding the parenting assessment or the restraining order between Mr. Viles and Mrs. Wrigley—information that Mr. Watson was aware of in November 2011, prior to [A.A.]'s placement with Anthony Viles.

10

Based on the foregoing undisputed facts and construing disputed facts in the light most favorable to the Plaintiff, the Court makes the following Conclusions of Law:

1. Assuming the existence of a duty owed to Plaintiffs by Defendants under RCW 26.44, there is a genuine issue of material fact as to whether Defendants breached that duty; and

2. Assuming the existence of a duty owed to Plaintiffs by Defendants under RCW 26.44, there is a genuine issue of material fact as to whether Defendants' breach was the proximate cause of Plaintiffs' injuries.

Based on the above . . . undisputed facts and disputed facts and Conclusions of Law, NOW THEREFORE, it is HEREBY Ordered that State Defendants' Motion for Partial Summary Judgment is GRANTED as to all of Plaintiffs' negligence-based claims including Plaintiffs' claims for Wrongful Death, all Survival Actions, Negligent Investigation, Negligent Training and Supervision, and Loss of Consortium, as Defendants did not owe a duty to Plaintiffs.

CP at 1597-98.

Of import, the trial court found, "Plaintiffs do not allege any negligence-based claims other than those that arise under RCW 26.44.050."[7] CP at 1597.

DSHS filed a second motion for summary judgment on all remaining claims, noted for September 16, 2016. The remaining claims included outrage, negligent misrepresentation, and publication of private facts under former RCW 74.13.500 (2009).[8] On September 2, the court

---

[7] The Wrigleys' assignment of error 4 states, "The trial court erred in finding [that] Plaintiffs did not allege any negligence-based claims other than those that arise under RCW 26.44.050. Finding 5." Br. of Appellants at 1. In addition, the Wrigleys' issues pertaining to assignments of error state, "Whether there were other negligence claims pleaded besides negligent investigation." Br. of Appellants at 1. The brief of the appellants does not explicitly make arguments to support this assignment of error and issue on appeal. Further, their amended complaint did not allege general common law negligence or another form of statutory negligence, which could provide the basis for relief. Thus, it appears all of the Wrigleys' negligence-based claims (i.e., wrongful death, loss of consortium, survival action, and negligent training/supervision) stemmed from their former RCW 26.44.050 negligent investigation cause of action.

[8] The Wrigleys did not appeal the dismissal of these claims on summary judgment.

held a scheduling conference to discuss the impending trial date of October 3. The court

continued the trial date because of other trials and conflicts. On September 9, the Wrigleys

moved for leave to file an amended complaint to add a claim of general negligence.

At the hearing on the motion to amend, the following exchange occurred:

> THE COURT: So, Mr. Preble, you've been part of this case, even though Mr. Moffitt has been the lead. You signed off on the amended complaint almost two years ago. And the State filed their motion originally in the spring, the one that I heard in July. Why did you not seek leave to amend to add the separate theory for negligence sooner? I remember asking Mr. Moffitt on summary judgment, "So your whole negligence theory is based upon this statute?" and he said, "Yes."[9] So why not do it sooner?
> MR. PREBLE: That was, I guess, an error on our part. That was something that had not been obvious to me, and I was not aware of his statement to you. However, I would note that inexcusable neglect is not a basis for denying a motion to amend, according to case law. I don't know that I would call it an excusable neglect, but --
> THE COURT: I didn't ask him why he hadn't had another theory; I just asked him to confirm his complaint, your complaint, was solely – the negligence theory was based solely on the specific statute that the State was addressing in their motion, and he confirmed that that was the case. And then I was surprised to see a motion to add a different theory, because I thought, "Why didn't that come up when the court was hearing about the negligence topic on summary judgment this summer?"
> MR. PREBLE: It should have. It should have. That's all I can say, and I'm regretful. . . . [W]e did not concede there was not negligence. The facts were all out there. We said these things were negligent. We just did not include the general negligence claim, which we should have.

Verbatim Report of Proceedings (VRP) (Sept. 16, 2016) at 19-22. The court orally held as

follows:

---

[9] We reviewed the verbatim report of proceedings from July 22, 2016, which transcribes the hearing for partial summary judgment that the trial court references at the hearing on the motion to amend. On the record before us, we could not locate an exchange in which the Wrigleys' attorney states that all negligence claims are based on former RCW 26.44.050.

Of course Civil Rule 15 says leave is given freely if justice so requires, and the case law indicates that the court considers whether there's unfair prejudice in thinking about whether justice requires allowing the amendment of the complaint.

In specifically considering the context I understand of the specifics of the case, whether there's been undue delay in presenting the new claim. And, in this case, having looked at several of the cases that have reviewed trial courts deciding on motions to amend, I think the facts are very important. This is a case that was filed in 2014. The complaint was amended in late 2014. The parties have been engaged in discovery and motion practice for quite some time, and the court heard comprehensive motion for summary judgment this summer on the negligence claim under the statute that had been pled. And but for the court's schedule and another case that was older, this case would be going to trial in a few weeks.

And all of that is part of the context, and, ultimately, I am going to deny the motion to amend and find that justice does not require the adding of this. I don't find that there is a justification for why this claim could not have been brought sooner. And, over the summer, it was clear that the negligence focus, the legal theory of the plaintiffs, had been throughout the entire case the statutory theory, and the plaintiffs confirmed that in July. And I'm finding that there is prejudice to the defendant if the court allows at this late stage in the case an amendment of this sort. So I'll deny the motion to amend.

VRP (Sept. 16, 2016) at 36-37.

In addition to denying the Wrigleys' motion to amend, the court also granted DSHS's motion for summary judgment on all remaining claims and dismissed the Wrigleys' amended complaint for damages. The court subsequently denied their motion for reconsideration.

The Wrigleys appeal, and DSHS cross-appeals.

ANALYSIS

I. SUMMARY JUDGMENT

The Wrigleys argue that DSHS owed them a duty of care under (1) former RCW 26.44.050, (2) the shelter care order, and (3) the special relationship doctrine. We agree that DSHS owed the Wrigleys a duty of care under former RCW 26.44.050, and we decline to reach whether a duty was owed under the shelter care order or the special relationship doctrine.

A.     Standard of Review

13

We review the trial court's grant of summary judgment de novo. *M.W. v. Dep't of Soc. & Health Servs.*, 149 Wn.2d 589, 595, 70 P.3d 954 (2003). We engage in the same inquiry as the trial court, *id.*, and consider all facts and make all reasonable, factual inferences in the light most favorable to the nonmoving party. *Rekhter v. Dep't of Soc. & Health Servs.*, 180 Wn.2d 102, 145, 323 P.3d 1036 (2014). Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. CR 56(c). Whether or not the element of duty exists in the context of negligence is a question of law that we review de novo. *Sheikh v. Choe*, 156 Wn.2d 441, 448, 128 P.3d 574 (2006).

B.      Duty to Investigate Under Former RCW 26.44.050

The Wrigleys argue that DSHS owed them a duty to investigate under former RCW 26.44.050 because DSHS received a report concerning the possible occurrence of abuse or neglect by Viles. DSHS argues it owed no such duty because it never received a report of past child abuse or neglect by Viles. We agree with the Wrigleys.

The resolution of this issue requires us to interpret former RCW 26.44.050. The meaning of a statute is a question of law reviewed de novo. *State v. Breazeale*, 144 Wn.2d 829, 837, 31 P.3d 1155 (2001). Our fundamental objective is to ascertain and carry out the legislature's intent, and if the statute's meaning is plain on its face, we give effect to that plain meaning as an expression of legislative intent. *Dep't of Ecology v. Campbell & Gwinn, L.L.C.*, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002).

Plain meaning is discerned from the ordinary meaning of the language at issue, the context of the statute in which that provision is found, related provisions, and the statutory

14

scheme as a whole. *Gorre v. City of Tacoma*, 184 Wn.2d 30, 37, 357 P.3d 625 (2015); *Campbell & Gwinn*, 146 Wn.2d at 9-12. Dictionaries are an appropriate source of plain meaning when the ordinary definition furthers the statute's purpose. *Gorre*, 184 Wn.2d at 37. If, after this inquiry, the statute remains susceptible to more than one reasonable meaning, the statute is ambiguous and it is appropriate to resort to aids to construction, including legislative history. *Campbell & Gwinn*, 146 Wn.2d at 9-12.

Former RCW 26.44.050 provides, in relevant part:

Except as provided in RCW 26.44.030(11), upon the receipt of *a report concerning the possible occurrence of abuse or neglect*, the law enforcement agency or the department of social and health services *must investigate* and provide the protective services section with a report in accordance with chapter 74.13 RCW, and where necessary to refer such report to the court.

(Emphasis added.)

The record is clear that Jessica informed DSHS that she previously had a restraining order against Viles because of threats he made against her and that he had an extensive criminal history and a reputation for violence. The record also shows that Jessica informed DSHS that Viles had threatened to cut her head off, had tried to run over her, and had dragged her upstairs in their home by her hair. The record shows further that when A.A. had been placed with Viles, Jessica told Watson that because of A.A.'s behavioral problems, if A.A. was with Viles, "he would be dead within six months." CP at 880. The question before us is whether those communications constitute "report[s] concerning the possible occurrence of abuse or neglect" by Viles. Former RCW 26.44.050.

Turning first to the definitions of ordinary English, the basic definition of "occurrence" is "something that takes place"; "the action or process of happening." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1561 (2002). "Possible," in the present context, is defined as "that

[which] may or might be the case." *Id.* at 1771. Title 26.44 RCW does not define the term

"report." "Report" could simply be defined as "something that gives information." WEBSTER'S,

*supra*, at 1925. Alternatively, it could be defined in a more legal sense as "[a] formal oral or

written presentation of facts or a recommendation for action." BLACK'S LAW DICTIONARY 1492

(10th ed. 2014).

The requirement to investigate under former RCW 26.44.050 is not triggered by a "report

of abuse or neglect," but by a "report concerning the possible occurrence of abuse or neglect."

Under its ordinary definitions, the latter phrase can mean a report showing abuse or neglect that

may or may not occur; that is, a report suggesting a reasonable possibility of abuse or neglect in

the future. Under its ordinary definitions, the phrase also can mean a report of past abuse or

neglect.

"Abuse or neglect" is defined by former RCW 26.44.020(1) (2012), to include

sexual abuse, sexual exploitation, or injury of a child by any person under circumstances which cause harm to the child's health, welfare, or safety, excluding conduct permitted under RCW 9A.16.100; or the negligent treatment or maltreatment of a child by a person responsible for or providing care to the child. An abused child is a child who has been subjected to child abuse or neglect as defined in this section.

"Negligent treatment or maltreatment," in turn, is defined by former RCW 26.44.020(16)

to include

an act or a failure to act, or the cumulative effects of a pattern of conduct, behavior, or inaction, that evidences a serious disregard of consequences of such magnitude as to constitute a clear and present danger to a child's health, welfare, or safety, including but not limited to conduct prohibited under RCW 9A.42.100. . . . [E]xposure to domestic violence as defined in RCW 26.50.010 that is perpetrated against someone other than the child does not constitute negligent treatment or maltreatment in and of itself.

These definitions simply define "abuse" and "neglect." They work equally well whether

the phrase, "concerning the possible occurrence of abuse or neglect," is restricted to incidents

16

that have already occurred or whether that phrase also looks to the possibility of abuse or neglect in the future. Former RCW 26.44.050.

Former RCW 26.44.030 (2013), however, speaks more directly to the question. This statute requires individuals in listed roles who have "reasonable cause to believe that a child *has suffered* abuse or neglect" to report the incident to DSHS or law enforcement. Former RCW 26.44.030(1) (emphasis added). The past tense makes clear that mandated reporting extends only to abuse and neglect that has already occurred.

RCW 26.44.050 is phrased differently. It simply says that DSHS must investigate when it receives a report of *the possible occurrence* of abuse or neglect. If this referred only to reports of past abuse and neglect from mandated reporters, then its use of "must investigate" would conflict with the detailed prescriptions in former RCW 26.44.030(11) directing family assessments in response to some mandated reports and investigations in response to others. To avoid this conflict, former RCW 26.44.050 must be interpreted to apply also to reports other than those mandated by former RCW 26.44.030. This conclusion also explains the role of the introductory clause of former RCW 26.44.050, "[e]xcept as provided in RCW 26.44.030(11)." For these reasons, former RCW 26.44.030 does not restrict the reference to "possible occurrence of abuse or neglect" in former RCW 26.44.050 to past occurrences. Nor does it restrict the information triggering the duty to investigate under former RCW 26.44.050 to reports mandated by former RCW 26.44.030.

To this point, the examination of the terms in the provisions to be interpreted fairly leads to one conclusion: the phrase in former RCW 26.44.050, "report concerning the possible occurrence of abuse or neglect," is ambiguous. It may refer either to abuse or neglect that has already occurred or, in addition, it may also include abuse or neglect which is reasonably

17

possible in the future. The determination of plain meaning, however, does not stop at this point, but also examines "the context of the statute in which that provision is found, related provisions, and the statutory scheme as a whole." *Gorre*, 184 Wn.2d at 37 (quoting *Tingey v. Haisch,* 159 Wn.2d 652, 657, 152 P.3d 1020 (2007)). "Our ultimate task, of course, is to ascertain and carry out the legislature's intent." *Id.* We are guided in that examination by the decisions of our Supreme Court.

The primary purpose of former RCW 26.44.050 is to protect children and to preserve the integrity of the family. *Tyner v. Dep't of Soc. & Health Servs.*, *Child Protective Servs.*, 141 Wn.2d 68, 80, 1 P.3d 1148 (2000). In cases of conflict, the interests of the children prevail. *Tyner*, 141 Wn.2d at 79. To achieve those ends, "RCW 26.44.050 places an affirmative duty of investigation on the State." *Tyner*, 141 Wn.2d at 80.

If the phrase, "the possible occurrence of abuse or neglect," is read to refer only to past abuse, then DSHS would have no duty to investigate when reports showed that a proposed placement would be dangerous for a child, although no abuse had yet occurred. Waiting until tragedy has already descended does nothing to protect the child. Thus, legislative intent is ill served by confining former RCW 26.44.050 only to reports of past abuse or neglect.

This conclusion is buttressed by the scope of the duty to investigate. In *M.W.*, 149 Wn.2d at 595, our Supreme Court reiterated that former RCW 26.44.050 requires DSHS to investigate child abuse and that "this statutory duty implies a cause of action for children and parents for negligent investigation in certain circumstances." Such a claim, our Supreme Court stated, involves allegations

> that DSHS failed to adequately investigate a child's living situation before making a placement decision to remove a child from a nonabusive home, let a child remain in an abusive home, or place a child in an abusive home.

18

*Id.* It held that the State was not liable for a harmful examination, which it performed on a sexual abuse victim, because it did not result in a harmful placement decision. *M.W.*, 149 Wn.2d at 601-02.

The present appeal, in contrast, involves exactly that: a harmful placement decision. DSHS was in possession of reports showing acute danger to A.A. through placement with Viles. DSHS failed to investigate those reports, and it placed A.A. with Viles. To read the phrase at issue in former RCW 26.44.050 to impose no duty on DSHS to investigate, because Viles had not yet harmed A.A., cuts the heart from the State's duty to adequately investigate a child's living situation before making a placement decision that could place a child in an abusive home, recognized by *M.W.*, 149 Wn.2d at 595. To honor the purpose of RCW 26.44.050 recognized by *Tyner*, and to preserve the scope of the State's duty to investigate under *M.W.*, any ambiguity in RCW 26.44.050 can be resolved in only one way: the phrase "reports concerning the possible occurrence of abuse or neglect" contemplates both reports concerning incidents that have already occurred and reports suggesting a reasonable possibility of future abuse or neglect if the placement is made.

Our opinion in *M.M.S. v. Department of Social and Health Services and Child Protective Services*, 1 Wn. App. 2d 320, 404 P.3d 1163 (2017), *review denied*, 190 Wn.2d 1009 (2018), does not suggest the contrary. M.M.S. was subjected to unwanted sexual advances by her stepbrother, whom the State had placed with her family. *Id.* at 323. The closed files from prior dependencies concerning the stepbrother contained reports of inappropriate sexual behavior by the stepbrother against others. *Id.* at 324. M.M.S. and her mother filed a lawsuit against the State alleging, among other matters, that the State breached its duty to investigate under former RCW 26.44.050. *Id.* at 325. Specifically, we noted that the mother argued "that the

Department's liability arises *only* from [a state social worker's] failure to discover and disclose [J.A.]'s prior sexualized behavior that was documented in the earlier dependencies." *Id.* at 325.

We held that the State had no duty to search out, discover and disclose the information in the closed files of prior dependencies. *Id*. at 326-28. In the absence of that duty, we concluded there were no reports of possible abuse or neglect that triggered a duty to investigate under former RCW 26.44.050. *Id*. at 330, 332.

The present appeal presents a markedly different situation. As part of the very proceeding to place A.A. with Viles, Jessica informed CPS about Viles' extensive criminal history, his arrest for providing alcohol to minors, his threat to cut Jessica's head off, his attempt to run over her, his dragging her up the stairs by her hair, the restraining order against him, and her concerns about A.A. being placed with Viles due to his history of domestic violence. Most strikingly, after the initial 30 day placement with Viles was ordered, Jessica called the CPS social worker and reminded him again of the incidents in which Viles had been violent with her or threatened her and told him flatly that if A.A. was with Viles, "he would be dead within six months." CP at 880. Wrigley's claim does not, as in *M.M.S.*, place a duty on DSHS to research its archives of past dependencies. Instead, it simply requires DSHS to properly take into account information that was presented directly to it as part of the placement proceeding at issue. *M.M.S.* does not restrict that duty to investigating reports of past abuse or neglect.[10]

---

[10] We note the statement in *M.M.S.* that "[h]ere, there was no report that M.M.S. was abused or neglected before [J.A.] was placed in the home." 1 Wn. App. 2d at 330. This is simply a recognition that other than the statements in the closed archives, there were no reports of abuse or neglect. In context, it cannot be taken as a holding that the duty to investigate in former RCW 26.44.050 is triggered only by reports of past abuse or neglect against the victim. If it were so read, it would conflict with the Supreme Court decisions in *Tyner* and *M.W.*, as discussed above.

Further, the fact that the reports triggering the dependency proceeding were of abuse by Jessica does not erode the responsibility of DSHS to protect the child in making the placement decision. As shown, DSHS received information showing not only the "possible occurrence" of abuse or neglect, but a direct threat of harm to A.A. if placed with Viles. DSHS failed to investigate that threat. That failure violated the duty to investigate imposed by former RCW 26.44.050.

To conclude, the phrase "reports concerning the possible occurrence of abuse or neglect" in former RCW 26.44.050 contemplates both reports of incidents that have already occurred and reports suggesting a reasonable possibility of future abuse or neglect if the placement decision is made. The record contains evidence, noted above, that DSHS received reports showing a palpable danger to A.A. if he were placed with Viles. The record contains evidence that not only did DSHS fail to adequately investigate those reports, but at the motion on placement with Viles, it also did not provide all material information it had gathered to the dependency court, including information about Viles' prior arrests or Jessica's allegations of violence or her concerns regarding placement of A.A. with Viles.

Therefore, we hold the superior court erred in granting partial summary judgment to DSHS on the Wrigleys' negligence claim under former RCW 26.44.050.

A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record in accordance with RCW 2.06.040, it is so ordered.

C.      Duty Under the Shelter Care Order

The Wrigleys argue DSHS had a duty under the shelter care order to prevent placement of A.A. with his biological father. We decline to address this claim under RAP 9.12.

21

RAP 9.12 provides:

> On review of an order granting or denying a motion for summary judgment the *appellate court will consider only evidence and issues called to the attention of the trial court*. The order granting or denying the motion for summary judgment shall designate the documents and other evidence called to the attention of the trial court before the order on summary judgment was entered. Documents or other evidence called to the attention of the trial court but not designated in the order shall be made a part of the record by supplemental order of the trial court or by stipulation of counsel.

(Emphasis added.) In *Mithoug v. Apollo Radio of Spokane*, 128 Wn.2d 460, 462, 909 P.2d 291

(1996), our Supreme Court clarified:

> The Court of Appeals was apparently of the view that RAP 9.12 and the case[ ]law on summary judgments limit appellate review to evidence "considered" by the trial court. This is not what RAP 9.12 actually says. Rather, it says that the trial court in its order "shall designate the documents and other evidence *called to the attention of the trial court* before the order on summary judgment was entered." (Emphasis added.) On review, the appellate court "will consider only evidence and issues *called to the attention of the trial court.*" (Emphasis added.) "The purpose of this limitation is to effectuate the rule that the appellate court engages in the same inquiry as the trial court."

In this case, the Wrigleys did not raise the issue of duty under the court shelter care order

before the court entered the summary judgment order. Because we engage in the same inquiry as

the trial court, we decline to reach the merits of the Wrigleys' new contention on appeal.

D.      Duty Under the Special Relationship Doctrine

The Wrigleys argue that DSHS and its employees had a duty of care under the special relationship doctrine. We decline to address this claim under RAP 9.12.

The Wrigleys rely on *HBH v. State*, 197 Wn. App. 77, 85-95, 387 P.3d 1093 (2016), *review granted*, 189 Wn.2d 1002 (2017), to argue DSHS had a duty under the special relationship doctrine. In *HBH*, we addressed whether DSHS owes a duty of reasonable care to investigate the health and safety of children it places in foster homes based on a special protective relationship between the agency and those children. *Id.* at 85-86. We held DSHS had a duty to exercise ordinary care to protect foster children from abuse on the basis of its special relationship with such children. *Id.* at 92.

Although DSHS may have had a special relationship and duty of care, under a general negligence theory, the Wrigleys did not make these arguments in the trial court. On review of summary judgment, we consider only evidence and issues called to the attention of the trial court. RAP 9.12; *Mithoug*, 128 Wn.2d at 462. We engage in the same inquiry as the trial court. Therefore, we also decline to reach the merits of this contention.

II. MOTION TO AMEND

The Wrigleys argue the trial court erred when it denied their motion for leave to amend its complaint to add a general negligence theory. We agree.

A.      Standard of Review

We review the trial court's ruling on a request to amend for a manifest abuse of discretion. *Herron v. Tribune Publ'g Co.*, 108 Wn.2d 162, 165, 736 P.2d 249 (1987). A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons. *In re Marriage of Littlefield*, 133 Wn.2d 39, 46-47, 940 P.2d 1362

23

(1997). A trial court's decision is manifestly unreasonable if it is outside the range of acceptable choices, given the facts and the applicable legal standard; it is based on untenable grounds if the factual findings are unsupported by the record; it is based on untenable reasons if it is based on an incorrect standard or the facts do not meet the requirements of the correct standard. *Id.* at 47.

B.      Legal Principles

CR 15(a) governs amendments to pleadings and provides, in pertinent part, that "a party may amend [his] pleading only by leave of court . . . and leave shall be freely given when justice so requires." The purposes of CR 15 are to enable a proper decision on the merits and to provide each party with sufficient notice regarding the basis of the claims or defenses asserted against him. *Herron*, 108 Wn.2d at 165. The United States Supreme Court has concluded

> [where] the amendment would have done no more than state an alternative theory for recovery, . . . [and where] the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, [the plaintiff] ought to be afforded an opportunity to test his claim on the merits.

*Foman v. Davis*, 371 U.S. 178, 181-82, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962) (discussing Rule 15 of the Federal Rules of Civil Procedure); *see also Herron*, 108 Wn.2d at 165-66.

In any such case, "[t]he touchstone for the denial of a motion to amend is the prejudice such an amendment would cause to the nonmoving party." *Wilson v. Horsley*, 137 Wn.2d 500, 505, 974 P.2d 316 (1999). Factors which may be considered in determining whether permitting amendment would cause prejudice include undue delay, unfair surprise, and jury confusion. *Id.* at 505-06. Although not dispositive, the timing of a motion may result in prejudice. *Herron*, 108 Wn.2d at 166.

C.      DSHS Not Prejudiced

The Wrigleys argue that the trial court erred in denying their motion to amend because DSHS has not demonstrated that it would be prejudiced by the amendment. DSHS argues that

the trial court did not err when it concluded that the Wrigleys' proposed amendment would result in prejudice.

> At the hearing on the motion, the trial court opined on the matter of undue delay:

> This is a case that was filed in 2014. The complaint was amended in late 2014. The parties have been engaged in discovery and motion practice for quite some time, and the court heard [a] comprehensive motion for summary judgment this summer on the negligence claim under the statute that had been pled. And but for the court's schedule and another case that was older, this case would be going to trial in a few weeks.
> . . . I don't find that there is a justification for why this claim could not have been brought sooner.

VRP (Sept. 16, 2016) at 36-37. Initially, it appeared the trial court denied the Wrigleys' motion on the sole basis that it was untimely: it concluded that "there is prejudice to the defendant if the court allows at this late stage in the case an amendment of this sort." VRP (Sept. 16, 2016) at 37. However, after the Wrigleys moved for reconsideration, the court clarified:

> I know the primary argument that the plaintiff made in the motion for reconsideration is that the court's decision a few weeks ago was based only on the concept of further delay. And I did look back at the arguments and my analysis, and I don't believe that my consideration was only based upon delay, but based upon the timeliness of the issue being raised, the fact that, in July, counsel for the plaintiff indicated the only theory was the statutory-based theory, the opportunity for the plaintiff to have raised it earlier and, from this court's perspective, ultimately the question of prejudice as well.

VRP (Oct. 6, 2016) at 11.

The first factor we examine under *Wilson* in determining prejudice is undue delay. 137 Wn.2d at 505. The Wrigleys argue undue delay alone is not enough for the trial court to deny their motion because undue delay must be accompanied by prejudice to the nonmoving party. The Wrigleys claim that because the trial was continued, DSHS would have had the opportunity to bring a dispositive motion related to their general negligence claim; they also argue additional discovery would likely have been unnecessary because the facts involving statutory negligence

25

mirror the facts applicable to their general negligence claim. DSHS argues the trial court applied the correct law, exercised sound discretion, and we should not disturb its ruling. DSHS claims the trial court considered all the factors, including undue delay, and concluded prejudice would result.

Although the court concluded that "there is prejudice to the defendant if the court allows at this late stage in the case an amendment of this sort," VRP (Sept. 16, 2016) at 37, DSHS did not describe or provide argument as to how the timing or undue delay of the Wrigleys' motion would result in prejudice; notwithstanding the obvious task of having to defend against a claim of general negligence, which would result in additional work.[11] Still, the amendment would have done no more than provide an alternative theory for recovery, and the underlying facts or circumstances relied on by the Wrigleys are the same. Moreover, a pretrial amendment to the complaint would have provided DSHS with sufficient notice regarding the basis of the general negligence claim the Wrigleys wished to assert at trial. Further, DSHS would have had the opportunity to bring another dispositive motion prior to trial. We hold DSHS has not shown that any undue delay would result in prejudice.

Another factor we consider is unfair surprise. *Wilson*, 137 Wn.2d at 507. The Wrigleys argue,

---

[11] In a concurrence and dissent in *Wilson*, Justice Sanders cogently argued:

> Delay, per se, i[s] no reason for denial. If it were, no leave to amend would ever be allowed as amendments are by their nature delayed beyond the original pleading. Delay, excusable or not, i[s] not sufficient reason to deny a motion to amend unless it works some undue hardship or prejudice upon the opposing party. Horsley filed his motion to amend seven months after he filed his original pro se answer. How "undue" was this delay is a matter of opinion: however, we have held that a delay of over five years is acceptable absent a showing of prejudice by the party opposing amendment.

137 Wn.2d at 514 (internal citations omitted).

> DSHS has been on notice of Plaintiffs' negligence claims from the outset and this issue has been the primary focus of litigation. DSHS simply cannot contend that the addition of a general claim for negligence presents an unfair surprise.

Br. of Appellant at 18. DSHS claims that because the Wrigleys confirmed in court that they would not be pursuing a general negligence theory, it was unfairly surprised by the Wrigleys' change in position. Again, the amendment would have done no more than state an alternative theory of negligence, and the underlying facts or circumstances relied on by the Wrigleys are the proper subject of relief. DSHS should not have been shocked or astonished—that is, surprised— when the Wrigleys sought leave to amend after the Wrigleys' statutory negligence claims were dismissed on summary judgment and the case was continued by the trial court. We agree with Wrigley: "negligence is at the heart of this case, it has been alleged from the beginning, and it has been the parties' primary focus in discovery and litigation." Br. of Appellant at 18. Thus, we hold DSHS has not shown it was unfairly surprised by the proposed amendment.

> The last factor to be considered under *Wilson* is jury confusion. The Wrigleys argue,

> with the other negligence claims dismissed on summary judgment because of the narrow scope of DSHS' duty with respect to non-subject parents under RCW 26.44.050, this would be the only negligence-related claim presented.

Br. of Appellant at 18. DSHS argues that the Wrigleys' former RCW 26.44.050 negligent investigation claims were properly dismissed on summary judgment, and the Wrigleys' argument tacitly concedes the issue above. Even though we reverse the dismissal of the Wrigleys' claim under former RCW 26.44.050 on appeal, we cannot agree that deciding claims under former RCW 26.44.050 and general negligence would unduly confuse a jury.

> In *Herron*, our Supreme Court recognized that "[a]ppellate decisions permitting amendments have emphasized that the moving parties in those cases were merely seeking to assert a new legal theory based upon the same circumstances set forth in the original pleading."

108 Wn.2d at 166. Accordingly, when the amendment seeks only to assert a new legal theory based on the same circumstances set forth in the original pleading, it should be allowed. *See id.* Such is the case here. Under *Herron*, the presence of the negligence claims in this matter is not reason to deny the amendment.

For these reasons, we hold the trial court abused its discretion when it denied the Wrigleys' motion for leave to amend. On remand, the Wrigleys may raise their requested claim of general negligence, including claims based on the shelter care order, special relationship and/or entrustment.

## III. DSHS CROSS-APPEAL

### A. Proximate Cause

DSHS argues it is entitled to summary judgment as a matter of law because the Wrigleys failed to create an issue of material fact on proximate cause. Because we hold that the trial court abused its discretion when it denied the Wrigleys' motion to amend, we do not reach this issue on cross-appeal.

### B. Expert Testimony

DSHS argues the trial court abused its discretion when it refused to strike opinions offered by the Wrigleys' standard of care expert, Ulrich, that were based on inadmissible evidence and legally inapplicable procedures. We disagree.

An expert's opinion is admissible if the witness is properly qualified, relies on generally accepted theories, and the expert's testimony is helpful to the trier of fact. *Philippides v. Bernard*, 151 Wn.2d 376, 393, 88 P.3d 939 (2004). Trial courts are afforded wide discretion on issues of evidence and trial court expert opinion decisions will not be disturbed on appeal absent

an abuse of discretion. *Johnston-Forbes v. Matsunaga*, 181 Wn.2d 346, 352, 333 P.3d 388 (2014).

In Washington, there are four key evidence rules that govern the use of expert witnesses. ER 702 largely establishes when expert testimony may be utilized at trial:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

ER 703 permits an expert to base his or her opinion on evidence not admissible and to base his or her opinion on facts or data perceived by or made known to the expert at or before the hearing. ER 704 permits an expert to testify on an ultimate issue the trier of fact must resolve. Finally, ER 705 indicates that an expert need not disclose the facts on which his or her opinion is based, although the court may require their disclosure and the expert may be subject to cross-examination on them.

With these standards in mind, we turn to the admissibility of the expert testimony Ulrich provided.

DSHS first argues the trial court erred in failing to strike Ulrich's declaration that related to DSHS's noncompliance with procedures set forth in the ICPC. DSHS claims the ICPC[12] did not apply to Viles as the biological parent because A.A. had not been found dependent and cites *In re Dependency of D.F.-M.*, 157 Wn. App. 179, 236 P.3d 961 (2010). In *D.F.-M.*, Division One of our court held that the ICPC, which applies to placements in foster care, does not apply to parental placements. 157 Wn. App. at 183. Still, Ulrich expressly acknowledged in her declaration that the ICPC would not apply to the issues involved in this case. Ulrich instead used

---

[12] Chapter 26.34 RCW.

the ICPC to provide a comparative analysis and discuss "why an adequate assessment was not completed in this case." CP at 1574. Ulrich stated in her declaration:

> ICPC is a systematic process intended for use in out-of-state placements for children and families involved in the dependency process. ICPC, as it is intended, does not technically apply in this case, as [A.A] was not yet a dependent of the State of Washington. However, it is important to note that ICPC also does not *prevent* the Department from using their available safety and risk assessment tools and fulfilling their legal obligation to assess and plan for the safety of the child in their care and custody. The file review of the case involving [A.A] revealed that CA [(Children's Administration)] staff did not properly use the safety or risk assessment tools as intended.

CP at 967.

Ulrich had 23 years of experience in the area of safety and risk assessment in child welfare and child protection, training and experience as a forensic child interviewing specialist, and was the regional lead for the State of Washington on child safety and child welfare. She also performed independent work interviewing children involved in custodial disputes and had myriad other training and experience in the field. This knowledge, skill, experience, and training qualified Ulrich as an expert on the area of safety and risk assessment in child welfare and child protection.

Her opinion that the ICPC provided a useful template for DSHS to fulfill their legal obligation to assess and plan for the safety of A.A., who was in their care and custody, would be helpful to the trier of fact insofar as it relates to proper evaluation of risk to child safety and child welfare. We hold that the trial court did not abuse its discretion when it refused to strike Ulrich's opinion because the protocols generally used in the ICPC are at least minimally relevant to the issue of standard of care in this matter.

Next, DSHS argues the trial court erred in failing to strike Ulrich's opinions regarding DSHS's failure to contact Idaho to obtain any records regarding Viles. DSHS claims there is no

statute, regulation, policy, or standard that would have required DSHS to do so. Although this much may be true, DSHS had responsibility for the safety and wellbeing of A.A., since he was in their care and custody.

The information Jessica provided to DSHS regarding Viles' history of domestic violence, history of drug abuse, reputation for violence in his community, and her sincere apprehension that Viles would abuse or neglect A.A. if placed in Viles' home provided a sufficient basis on which Ulrich could form an opinion regarding DSHS's failure to assess the risks of placement with Viles. Ulrich stated,

> For example, the Department could have asked for a domestic violence assessment, anger management assessment, or a chemical dependency assessment of Mr. Viles. All of these formal assessments, completed by a professional in Idaho, would have led the Department to be able to identify any potential areas of risk and/or safety that they needed to plan for prior to deciding about the appropriateness of transitioning [A.A.] to the home of Mr. Viles.

CP at 971. Ulrich's testimony would have been helpful to the trier of fact insofar as DSHS may have failed to adequately assess the risk and safety of placing A.A. with Viles.

We hold that the trial court did not abuse its discretion when it refused to strike Ulrich's opinion.

## CONCLUSION

We hold that DSHS owed the Wrigleys a duty of care under former RCW 26.44.050, and we reverse the order granting DSHS's motion for partial summary judgment and dismissing the Wrigleys' claim under former RCW 26.44.050. We decline to address the issue of duty under the shelter care order and the special relationship doctrine under RAP 9.12, and we hold the trial court abused its discretion when it denied the Wrigleys' motion to amend their complaint to add a general negligence theory. In the cross-appeal, we do not reach the issue of proximate cause,

31

and we hold the trial court did not abuse its discretion when it refused to strike the opinions

offered by the Wrigleys' expert.

We reverse and remand.

Bjorgen, J.

I concur:

Penoyar, J.P.T.

SUTTON, J. (dissent in part) — This case presents an issue of the scope of DSHS's duty to investigate a report of abuse or neglect of a minor child under RCW 26.44.050 and when the duty to investigate is triggered.

The majority holds that DSHS has a duty to investigate a father under RCW 26.44.050 based on the mother's allegations of the father's prior violence against her, his prior criminal history, and speculation about possible future abuse or neglect of their minor child, A.A., when there is no report of abuse or neglect of A.A. or any minor child by the father. The majority reasons that the mother's allegations against the father constitute a report of possible abuse or neglect of a minor child triggering a duty by DSHS to investigate under RCW 26.44.050. The majority reasons that the phrase "report concerning the possible occurrence of abuse or neglect" of a minor child in RCW 26.44.050 is ambiguous, and that the phrase "may refer either to abuse or neglect that has already occurred or, in addition, it may include also abuse or neglect which is reasonably possible in the future." Majority at 17-18. The majority concludes that legislative intent is ill served by confining RCW 26.44.050 to reports of past abuse or neglect.

The majority's holding expands the scope of DSHS's duty to investigate any report of abuse or neglect of anyone, not just a duty to investigate a report of abuse or neglect of the minor child at issue. I respectfully disagree with the majority's holding that DSHS has a duty of care to the mother to investigate the father under RCW 26.44.050 based on her allegations. For the reasons explained below, I would affirm the superior court's order granting DSHS's partial summary judgment motion and dismissing the negligence claims. I join the majority as to the remaining issues addressed in the majority opinion except for the issue of whether the trial court erred by not striking the mother's expert. I do not reach that issue because DSHS does not have a duty to investigate.

FACTS

I agree with the majority's presentation of the facts, but for clarity the following material facts are outlined.

Following reports of abuse of A.A. by his mother, Jessica Wrigley, and his stepfather, Jared Wrigley,[13] DSHS filed a dependency petition. Anthony Viles, A.A.'s father, filed a motion with the juvenile court to have A.A. placed with him in Idaho. In relevant part, Jared's attorney stated that Jared was aware of Viles' violent past, he had concerns, and he wanted a "better investigation done before [A.A.] is moved." Clerk's Papers (CP) at 304-05. Jessica's attorney stated that Jessica had "no strong position either way." CP at 305. After hearing arguments and considering the record, the court granted Viles' motion, ordered A.A. to be released from shelter care, and placed A.A. with Viles "for a visit" for 30 days. CP at 312.

In mid-February, Jessica contacted social worker Don Watson and expressed her concerns regarding A.A.'s placement with Viles, telling Watson about Viles' history of violence toward her and him providing alcohol to a minor. She also told Watson that because of A.A.'s behavioral issues, A.A. "would be dead within six months" if he were placed with Viles. CP at 880.

Jessica informed DSHS that she previously had a restraining order against Viles because of threats he had made against her, and that he had an extensive criminal history and a reputation for violence. The record also shows that Jessica informed DSHS that Viles had threatened to cut her head off, tried to run over her, and dragged her upstairs by her hair. Further, DSHS knew that Viles had been arrested for harboring a minor runaway and had been convicted of providing alcohol to a minor.

---

[13] We use the minor child's initials to protect his identity. Because Jessica and Jared Wrigley share a surname, we refer to them by their first names. We mean no disrespect.

Ultimately, the court did not enter a dependency order, and instead found that placement with Viles was in A.A.'s best interest. The court ordered A.A. be placed with Viles in Idaho and dismissed the dependency petition.

ANALYSIS

I. SUMMARY JUDGMENT

Jessica argues that based on her allegations against Viles, DSHS owes her a duty to investigate under RCW 26.44.050.[14] The majority holds that DSHS has a duty to investigate under RCW 26.44.050 because it received a report of a possible future occurrence of child abuse or neglect by Viles. For the reasons explained below, I disagree with the majority's holding.

A. STANDARD OF REVIEW

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. CR 56(c).

We review the superior court's grant of summary judgment de novo. *M.W. v. Dep't of Soc. & Health Servs.*, 149 Wn.2d 589, 595, 70 P.3d 954 (2003). We engage in the same inquiry as the superior court. *M.W.*, 149 Wn.2d at 595. We consider all facts and make all reasonable, factual inferences in the light most favorable to the nonmoving party. *Rekhter v. Dep't of Soc. & Health Servs.*, 180 Wn.2d 102, 145, 323 P.3d 1036 (2014).

A negligence claim requires that the plaintiff demonstrate that the defendant owed a duty to plaintiff; that defendant breached that duty; that the breach of duty caused some injury to

---

[14] The court below found that Jessica's negligent investigation claim was based on RCW 26.44.050. Notably, Jessica did not reference RCW 26.44.050 in her pleadings.

plaintiff; and the plaintiff suffered damages. *Kim v. Lakeside Adult Family Home*, 186 Wn. App. 398, 408, 345 P.3d 850 (2015), *aff'd in part, rev'd in part,* 185 Wn.2d 532 (2016). Generally, whether the duty element exists in the negligence context is a question of law that we review de novo. *Sheikh v. Choe*, 156 Wn.2d 441, 448, 128 P.3d 574 (2006). But, where the existence of a legal duty is dependent on disputed material facts, summary judgment is inappropriate. *Mita v. Guardsmark, LLC*, 182 Wn. App. 76, 83, 328 P.3d 962 (2014); *see Kim*, 186 Wn. App. at 408.

B. DHSH'S DUTY PURSUANT TO RCW 26.44.050

Jessica argues, and the majority agrees, that DSHS owed her a duty of care to investigate Viles under RCW 26.44.050 based on her allegations against Viles of his prior violence against her, his prior criminal history, and her claims of possible abuse or neglect of A.A. by Viles. The majority concludes that DSHS received reports concerning the possible occurrence of abuse or neglect by Viles, thus, triggering a duty to investigate. I respectfully disagree as explained below.

We look to RCW 26.44.050 to determine whether DSHS owes a duty to investigate based on Jessica's allegations. Issues of statutory interpretation are questions of law that we review de novo. *Dep't of Ecology v. Campbell & Gwinn, L.L.C.*, 146 Wn.2d 1, 9-10, 43 P.3d 4 (2002). Our fundamental objective is to ascertain and carry out the legislature's intent, and if the statute's meaning is plain on its face, we give effect to that plain meaning as an expression of legislative intent. *Campbell & Gwinn*, 146 Wn.2d at 9-10.

To evaluate the plain language, we consider the text of the provision in question, the context of the statute in which the provision is found, and related statutes. *Jametsky v. Olsen*, 179 Wn.2d 756, 762, 317 P.3d 1003 (2014); *Campbell & Gwinn*, 146 Wn.2d at 10. "Legislative definitions provided in a statute are controlling, but in the absence of a statutory definition, courts

may give a term its plain and ordinary meaning by reference to a standard dictionary." *Fraternal Order of Eagles, Tenino Aerie No. 564 v. Grand Aerie of Fraternal Order of Eagles*, 148 Wn.2d 224, 239, 59 P.3d 655 (2002). If, after this inquiry, the statute remains susceptible to more than one reasonable meaning, the statute is ambiguous and it is appropriate to resort to aids to construction, including legislative history. *Campbell & Gwinn*, 146 Wn.2d at 12.

We avoid a literal reading of a statute that would result in unlikely, absurd, or strained consequences. *Fraternal Order of Eagles*, 148 Wn.2d at 239. "'The spirit or purpose of an enactment should prevail over . . . express but inept wording.'" *Fraternal Order of Eagles*, 148 Wn.2d at 239 (alteration in original) (quoting *State v. Day*, 96 Wn.2d 646, 648, 638 P.2d 546 (1981). We do not add language to an unambiguous statute under the guise of interpretation. *In re Estate of Mower*, 193 Wn. App. 706, 713, 374 P.3d 180 (2016).

1. Negligent investigation claim

Law enforcement and DSHS must investigate reports of abuse or neglect of a minor child pursuant to RCW 26.44.050. RCW 26.44.050 provides:

> [U]pon the receipt of a report concerning the possible occurrence of abuse or neglect, the law enforcement agency or the department must investigate and provide the protective services section with a report in accordance with chapter 74.13 RCW, and where necessary to refer such report to the court.

The primary purpose of RCW 26.44.050 is to protect children and to preserve the integrity of the family. *Tyner v. Dep't of Soc. & Health Servs.*, 141 Wn.2d 68, 80, 1 P.3d 1148 (2000); RCW 26.44.010. To achieve that end, DSHS has a statutory duty to investigate reports of child abuse or neglect. *Albertson v. State*, 191 Wn. App. 284, 299, 361 P.3d 808 (2015).

Because the legislature enacted RCW 26.44.050 to benefit children who are subjects of reports concerning possible abuse or neglect, "parents and children have an implied cause of action against law enforcement and DSHS for negligent investigation under certain circumstances."

*McCarthy v. Clark County*, 193 Wn. App. 314, 328-29, 376 P.3d 1127, *review denied*, 186 Wn.2d 1018 (2016); *M.W.*, 149 Wn.2d at 595. The negligent investigation claim under RCW 26.44.050 is a "narrow exception" to the rule that there is no general tort claim for negligent investigation. *M.W.*, 149 Wn.2d at 601.

A negligent investigation claim is available only when DSHS conducts an incomplete or biased investigation that "resulted in a harmful placement decision." *M.W.*, 149 Wn.2d at 601. "A harmful placement decision includes 'removing a child from a nonabusive home, placing a child in an abusive home, or letting a child remain in an abusive home.'" *McCarthy*, 193 Wn. App. at 329 (quoting *M.W.*, 149 Wn.2d at 602). DSHS's duty to investigate is triggered by a report of possible abuse or neglect of a minor child. *M.M.S. v. Dep't of Soc. & Health Servs.*, 1 Wn. App.2d 320, 330, 404 P.3d 1163 (2017), *review denied*, 190 Wn.2d 1009 (2018).

The majority holds that DSHS's duty to investigate here is triggered by Jessica's allegations of prior violence by Viles against her, his prior criminal history, and claims of possible abuse or neglect of A.A. by Viles after Jessica consented to the placement of A.A. with Viles. As discussed below, I disagree that Jessica's allegations constitute a "report concerning the possible occurrence of abuse or neglect" of a minor child triggering a duty by DSHS to investigate under RCW 26.44.050.

2. DSHS did not receive a report concerning the possible occurrence of child abuse or neglect by Viles under RCW 26.44.050

The issue is whether the information that DSHS received from Jessica constituted a "report concerning the possible occurrence of abuse or neglect" of a minor child, A.A., by Viles, thus triggering a duty to investigate under RCW 26.44.050. If it did receive such a report, then summary judgement was erroneous.

I agree with the majority that it is undisputed that

> [t]he record is clear that Jessica informed DSHS that she previously had a restraining order against Viles because of threats he made against her, and that he had an extensive criminal history and a reputation for violence. The record also shows that Jessica informed DSHS that Viles had threatened to cut her head off, had tried to run over her, and had dragged her upstairs in their home by her hair. The record shows further that when A.A. had been placed with Viles, Jessica told Watson that because of A.A.'s behavioral problems, if A.A. was with Viles, "he would be dead within six months." CP at 880.

Majority at 15.

I disagree, however, with the majority's conclusion that the above-quoted undisputed facts constitute a "report concerning the possible occurrence of abuse or neglect" of a minor child, A.A., by Viles. Majority at 21.

"Abuse or neglect" is defined as

> sexual abuse, sexual exploitation, or injury of a child by any person under circumstances which cause harm to the child's health, welfare, or safety, excluding conduct permitted under RCW 9A.16.100; or the negligent treatment or maltreatment of a child by a person responsible for or providing care to the child. An abused child is a child who has been subjected to child abuse or neglect as defined in this section.

RCW 26.44.020(1). "Negligent treatment or maltreatment" is defined as

> an act or a failure to act, or the cumulative effects of a pattern of conduct, behavior, or inaction, that evidences a serious disregard of consequences of such magnitude as to constitute a clear and present danger to a child's health, welfare, or safety, including but not limited to conduct prohibited under RCW 9A.42.100. When considering whether a clear and present danger exists, evidence of a parent's substance abuse as a contributing factor to negligent treatment or maltreatment shall be given great weight. The fact that siblings share a bedroom is not, in and of itself, negligent treatment or maltreatment. Poverty, homelessness, or exposure to domestic violence as defined in RCW 26.50.010 that is perpetrated against someone other than the child does not constitute negligent treatment or maltreatment in and of itself.

RCW 26.44.020(16).

Title 26.44 RCW does not define "report" or "occurrence." It does, however, address the contents and form a report. Specifically, RCW 26.44.040 provides that "[a]n immediate oral report" must be made by telephone or otherwise to the proper law enforcement agency or DSHS.

Further, to the extent that the information is known, the report must contain:

(1) The name, address, and age of the child;
(2) The name and address of the child's parents, stepparents, guardians, or other persons having custody of the child;
(3) The nature and extent of the alleged injury or injuries;
(4) The nature and extent of the alleged neglect;
(5) The nature and extent of the alleged sexual abuse;
(6) Any evidence of previous injuries, including their nature and extent; and
(7) Any other information that may be helpful in establishing the cause of the child's death, injury, or injuries and the identity of the alleged perpetrator or perpetrators.

RCW 26.44.040.

The above-quoted undisputed facts relate to reports made by Jessica and received by DSHS that Viles committed acts of domestic violence against Jessica, an adult, not against A.A. or any other minor child. None of the reports or allegations involve a report of a possible act of sexual abuse, sexual exploitation, or injury of a minor child by Viles under circumstances that would cause harm to a child's health, welfare, or safety. Further, the reports by Jessica do not include allegations of an act or failure to act, or a pattern of behavior that evidences a "serious disregard of consequences of such magnitude as to constitute a clear and present danger to a child's health, welfare, or safety." RCW 26.44.020(16). Therefore, the allegations do not constitute a "possible occurrence of abuse or neglect" of a minor child by Viles to trigger a duty to investigate under RCW 26.44.050.

Because the allegations do not constitute a "possible occurrence of abuse or neglect" of a minor child by Viles, I would hold that Jessica's allegations do not trigger a duty to investigate under RCW 26.44.050.

In sum, Jessica argues that DSHS had a duty of care to investigate Viles based on the information she provided to DSHS. Yet, RCW 26.44.050 imposes no such duty here. *See M.M.S.*, 1 Wn. App.2d at 331. The duty to investigate arises when DSHS receives "a report concerning the possible occurrence of child abuse or neglect" of a minor child. *M.M.S.*, 1 Wn. App.2d at 331. Because DSHS never received a report concerning the possible occurrence of child abuse or neglect of the minor child at issue, A.A., by Viles, I would hold that DSHS does not have a duty to investigate under RCW 26.44.050. Thus, based on the holding that DSHS did not owe a duty to investigate, I would affirm the superior court's order granting DSHS's motion for partial summary judgment, and dismissing the negligence claims under RCW 26.44.050.

_____
SUTTON, J.