

FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON

DATE JAN 2 3 2020

CHIEF JUSTICE

This opinion was
filed for record
at 8 a.m. on Jan 23, 2020

Susan L. Carlson
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| JESSICA WRIGLEY, individually, and as Personal Representative for the Estate of A.C.A, Deceased, and O.K.P., a minor child, and I.T.W., a minor child, by and through their biological mother, JESSICA WRIGLEY, Respondent, v. STATE OF WASHINGTON; DEPARTMENT OF SOCIAL & HEALTH SERVICES; DONALD WATSON & "JANE DOE" WATSON, husband and wife, individually and the marital community thereof; ALESSANDRO LAROSA & "JOHN DOE" LAROSA, husband and wife, individually and the marital community thereof; RACHEL WHITNEY & "JOHN DOE" WHITNEY, husband and wife, individually and the marital community thereof; JENNIFER GORDER & "JOHN DOE" GORDER, husband and wife, individually and the marital community thereof; "JOHN DOE" Social Worker & "JANE DOE" Social Worker, husband & wife, individually and the marital community thereof, 1 through 5, Petitioners. | No. 96830-6<br><br>En Banc<br><br>Filed    JAN 2 3 2020 |

JOHNSON, J.—This case requires us to interpret former RCW 26.44.050

(1999) to determine whether the Department of Social and Health Services

(DSHS)[1] received a "report concerning the possible occurrence of abuse or

neglect" sufficient to invoke its duty to investigate. Here, Jessica Wrigley brought

a negligent investigation claim against DSHS based on the placement of her son,

A.A., with his biological father, Anthony Viles, during dependency hearings.

Within three months of the placement, tragically, Viles killed A.A. The superior

court dismissed the claim on summary judgment, finding that the duty to

investigate was never triggered. In a split opinion, the Court of Appeals reversed

and held that the duty was triggered by Wrigley's prediction that Viles would harm

A.A. We reverse the Court of Appeals. Under the facts of this case, a report

predicting future abuse absent evidence of current or past conduct of abuse or

neglect does not invoke the duty to investigate under former RCW 26.44.050.

## FACTS AND PROCEDURAL HISTORY

A.A. was the six-year-old son of Wrigley and Viles. A.A. lived with his

mother and stepfather, the Wrigleys, until DSHS received its sixth referral alleging

---

[1] Subsequent to the filing of this case, on July 1, 2018, the powers, duties, and functions of the Children's Administration within that department were transferred to the newly formed Department of Children, Youth, and Families. RCW 43.216.906. For the purposes of this case, the department will be referred to as DSHS.

abuse and neglect by the Wrigleys and removed him from the home. A.A. was placed in shelter care, and DSHS filed a dependency petition.

At a family team decision-making meeting in early October 2011, Wrigley reported to DSHS representatives that Viles had a criminal history, reputation for domestic violence, and a record of previously abusing alcohol and drugs. She described that six years before, he had dragged her by the hair and threatened to kill her by cutting off her head and running her over, which led her to obtain a restraining order against him. Then, in late October, Wrigley called the assigned social worker, Don Watson, and notified him of the prior restraining order and that Viles had a criminal history, had been arrested for providing alcohol to a minor, and had never met A.A.

In November 2011, DSHS notified Viles of A.A.'s shelter care status, and Viles requested placement of A.A. with him, although he had no prior contact with A.A. Viles, who lived in Idaho, promptly provided six references; they all offered positive perspectives on his parenting skills with his biological daughter and fiancée's daughters.[2] DSHS ran a background check and found nothing disqualifying, although he had some criminal history.

---

[2] The references noted that he "would be 'a positive father figure for [A.A.],'" was a "'[p]atient, strong character, and very loving with his daughters,'" and "is a positive caretaker." Clerk's Papers at 250, 251. They emphasized his positive discipline techniques and did not report any cautions of abuse or neglect of children.

Viles formally petitioned for placement, and the court held two hearings—Wrigley did not attend either one. At the first hearing on January 30, 2012, the only concern about Viles was the lack of a preexisting relationship. Wrigley's counsel represented, "[M]y client has no strong position either way." Clerk's Papers (CP) at 305. The court temporarily placed A.A. with Viles for 30 days. On February 13, 2012, Wrigley called Watson, opposing the placement and claiming she never told her attorney she had no objections. She insisted that if A.A. remained with Viles, "'he would be dead within six months.'" CP at 880, 1516.

A week later, at the follow-up hearing, Watson and A.A.'s therapist reported the placement was positive. The court dismissed the petition with Wrigley's attorney in agreement. A.A. remained with Viles. In a tragic turn of events, A.A. died in April 2012 after Viles struck him on the head.[3]

Wrigley brought suit against the State and DSHS and asserted numerous claims: negligent investigation based on former RCW 26.44.050, wrongful death, outrage, loss of consortium, negligent misrepresentation, survival action, negligent training/supervision, and publication of private facts. The superior court found that all negligence-based claims arose under former RCW 26.44.050 and granted DSHS's partial summary judgment motion, dismissing all claims except outrage,

---

[3] Viles was subsequently convicted of manslaughter.

negligent misrepresentation, and publication of private facts. It found that the only allegations of abuse were against the Wrigleys and that DSHS did not owe a duty to plaintiffs because it never received a sufficient report to trigger that duty. It subsequently dismissed the remaining claims on summary judgment.

In a split published-in-part opinion, the Court of Appeals reversed the order of summary judgment as to the negligence claims based on former RCW 26.44.050 and remanded for trial.[4] The Court of Appeals concluded that DSHS' duty to investigate under former RCW 26.44.050 is triggered by "reports suggesting a reasonable possibility of future abuse or neglect if the placement [decision] is made." *Wrigley v. State*, 5 Wn. App. 2d 909, 929, 428 P.3d 1279 (2018). It held that Wrigley's communications triggered the duty to investigate because they suggested a "palpable danger to A.A. if he were placed with Viles." *Wrigley*, 5 Wn. App. 2d at 931. The interpretation was grounded in the statute's purpose as laid out in *Tyner v. Department of Social & Health Services*, 141 Wn.2d 68, 1 P.3d 1148 (2000), and the scope of the duty analyzed in *M.W. v. Department of Social & Health Services*, 149 Wn.2d 589, 70 P.3d 954 (2003).

---

[4] The Court of Appeals also reversed the trial court's denial of a motion to amend the complaint and remanded to allow plaintiffs to amend their complaint to add alternative negligence theories. That holding was not challenged.

The Court of Appeals' dissent opined that the majority's interpretation of "report" expands the scope of DSHS' duty to investigate too far and that Wrigley's statements did not trigger the duty. The dissent concluded that the communications did not allege any acts of abuse or neglect of a child by Viles as required by the statutory definitions of "abuse or neglect" and "negligent treatment or maltreatment," as provided under former RCW 26.44.020(1) and (14) (2010). Under the facts of this case, the dissent reasoned, "RCW 26.44.050 imposes no such duty here." *Wrigley*, 5 Wn. App. at 940 (Sutton, J., dissenting in part).

DSHS petitioned for review on the sole issue of whether Wrigley's predictions of future abuse constituted a "report concerning the possible occurrence of child abuse or neglect" invoking its duty to investigate under former RCW 26.44.050.[5] Pet. for Review at 12. We granted review. *Wrigley v. State*, 193 Wn.2d 1008, 439 P.3d 1065 (2019).

## ANALYSIS

This case involves the somewhat unique issue of what statements qualify as a "report" and, more specifically, can a prediction of future harmful conduct against a parent trigger the duty to investigate. The Court of Appeals has briefly touched on the scope of a duty-triggering report, properly recognizing that the

---

[5] The Washington State Association of Municipal Attorneys filed a brief as amicus curiae in support of petitioner, DSHS.

issue should be resolved on a case-by-case basis. *Yonker v. Dep't of Soc. & Health Servs.*, 85 Wn. App. 71, 81, 930 P.2d 958 (1997).

Generally, a report initiates the dependency process. The duty to investigate cannot be invoked until receipt of a report. Former RCW 26.44.050. DSHS argues that its duty to investigate is invoked by reports alleging past conduct of child abuse or neglect, and Wrigley's statement that if A.A. was left with Viles he "would be dead within six months" contained only future predictions that are insufficient to warrant further investigation. Wrigley defers to the Court of Appeals ruling and argues that her communications constituted a report "suggesting a reasonable possibility of future abuse or neglect." Resolution of this issue requires interpretation of former RCW 26.44.050.

The statute provides, in relevant part:

> Upon the receipt of a report concerning the possible occurrence of abuse or neglect, the law enforcement agency or the department of social and health services must investigate and provide the protective services section with a report in accordance with chapter 74.13 RCW, and where necessary to refer such report to the court.

Former RCW 26.44.050. Our inquiry focuses on the language "report concerning the possible occurrence of abuse or neglect."

The meaning of a statute is reviewed de novo. Our ultimate objective is to ascertain and carry out the legislature's intent. Plain meaning is discerned from the language, the statute's context, related provisions, and the statutory scheme as a

whole. *Gorre v. City of Tacoma*, 184 Wn.2d 30, 37, 357 P.3d 625 (2015). We construe the statute as a whole, giving effect to all of the language used and interpret provisions in relation to one another. *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9-12, 43 P.3d 4 (2002).

First, the ordinary meaning of "report concerning the possible occurrence of abuse or neglect" is ambiguous as to whether it encompasses allegations of future conduct. Chapter 26.44 RCW does not define "report," and the ordinary dictionary definition is "something that gives information." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1925 (2002). "Possible" has several ordinary meanings, including "that may or may not occur." WEBSTER'S, *supra*, at 1771. "Occurrence" means "[s]omething that happens or takes place." BLACK'S LAW DICTIONARY 1299 (11th ed. 2019). This language indicates that "possible occurrence" could encompass a communication concerning a future prediction of abuse, ongoing abuse, or completed instances of abuse. However, the statutory terms must be viewed in the context of the statute as a whole. *One Pac. Towers Homeowners' Ass'n v. HAL Real Estate Invs., Inc.*, 148 Wn.2d 319, 330, 61 P.3d 1094 (2002).

The statute defines "abuse or neglect" as

> sexual abuse, sexual exploitation, or injury of a child by any person
> under circumstances which cause harm to the child's health, welfare,

8

or safety, . . . or the *negligent treatment or maltreatment* of a child by a person responsible for or providing care to the child.

Former RCW 26.44.020(1) (emphasis added). "Negligent treatment or maltreatment" is defined as

an act or a failure to act, or the cumulative effects of a pattern of conduct, behavior, or inaction, that evidences a serious disregard of consequences of such magnitude as to constitute a clear and present danger to a child's health, welfare, or safety . . . . [E]xposure to domestic violence as defined in RCW 26.50.010 that is perpetrated against someone other than the child does not constitute negligent treatment or maltreatment in and of itself.

Former RCW 26.44.020(14).

The definition of "abuse or neglect" requires both (1) "sexual abuse, sexual exploitation, or injury of a child" and (2) "circumstances which cause harm to the child's health, welfare, or safety." Where, as in this case, no conduct of "sexual abuse, sexual exploitation, or injury of a child" has occurred, there are no "circumstances" in existence "which [would] cause harm to the child's health, welfare, or safety." Additionally, the definition of "negligent treatment or maltreatment" identifies "an act or a failure to act, or the cumulative effects of a pattern of conduct, behavior, or inaction," evidencing that reports must contain existing conduct. Former RCW 26.44.020(14).

Several related provisions offer further guidance. RCW 26.44.030 and RCW 26.44.040 contain the word "reports" in their title and evidence that reports are

9

intended to be backward looking, grounded in some past conduct. We may look to these related provisions for guidance because they address the same "reports" at different stages of the process—the duty to report (RCW 26.44.030, .040) and the duty to investigate once reports are received (RCW 26.44.050).

Former RCW 26.44.030(11)(a) (2009) states, "For reports of alleged abuse or neglect *that are accepted for investigation* by the department, the investigation shall be conducted" within a specific time frame. (Emphasis added.) This language informs that not all communications made to DSHS qualify as duty-triggering "reports." Only a specific class of reports will warrant DSHS' duty to investigate—those involving alleged abuse or neglect.

Further, former RCW 26.44.030(1) and (3) use past tense to describe incidents to be reported. Where a reasonable belief that "a child has *suffered* abuse or neglect" exists, certain professionals must report such incidents. Former RCW 26.44.030(1)(a) (emphasis added). The same language is used to describe incidents that "[a]ny other person" may report. Former RCW 26.44.030(3). These subsections incorporate RCW 26.44.040, which defines the required criteria for a report.

Reports themselves must contain, if known, information of the "nature and extent" of the "alleged" injury, neglect, or abuse. Former RCW 26.44.040 (2010)

(titled "Reports—Oral, written—Contents").[6] Where no conduct has yet occurred, there can be no information to convey on the "nature and extent" of any injury, neglect, or abuse. The word "alleged" also indicates that the event reported must be verified true or not. *See* BLACK'S, *supra*, at 94 (defining "alleged" as "[a]sserted to be true as described"). If an act has not yet occurred, it cannot be determined true or false; under this provision, the event must have already occurred or be currently ongoing.

The overall statutory purpose and scheme confirm that a report must allege some previous or existing behavior or conduct concerning the child. DSHS argues that allowing reports of future conduct that has not yet occurred frustrates its other obligations within the shelter care and dependency processes. We agree. For instance, after a sufficient report is received, a social worker is assigned to investigate. When the investigation is complete, DSHS is statutorily mandated to

---

[6] Former RCW 26.44.040 in full: "An immediate oral report must be made by telephone or otherwise to the proper law enforcement agency or the department of social and health services and, upon request, must be followed by a report in writing. Such reports must contain the following information, if known:
"(1) The name, address, and age of the child;
"(2) The name and address of the child's parents, stepparents, guardians, or other persons having custody of the child;
"(3) The nature and extent of the alleged injury or injuries;
"(4) The nature and extent of the alleged neglect;
"(5) The nature and extent of the alleged sexual abuse;
"(6) Any evidence of previous injuries, including their nature and extent; and
"(7) Any other information that may be helpful in establishing the cause of the child's death, injury, or injuries and the identity of the alleged perpetrator or perpetrators."

make a finding of whether the report is founded or unfounded. Former RCW 26.44.030(11)(a). The chapter defines "founded" as a "determination following an investigation by the department that, based on available information, it is more likely than not that child abuse or neglect *did occur*." Former RCW 26.44.020(9) (emphasis added). "Unfounded" means that "more likely than not, child abuse or neglect did not occur, or that there is insufficient evidence for the department to determine whether the alleged child abuse *did or did not* occur." Former RCW 26.44.020(24) (emphasis added). DSHS correctly contends that it would be impossible to make a finding of whether child abuse "did or did not occur" on a report based on speculation of future abuse because there would be nothing to assess. Thus, some conduct or incident must exist to make a finding of whether child abuse or neglect occurred.

This interpretation is consistent with the statutory declaration of intent:

> [I]nstances of nonaccidental injury, neglect, death, sexual abuse and cruelty to children by their parents, custodians or guardians have occurred, and in the instance where a child is deprived of his or her right to conditions of minimal nurture, health, and safety, the state is justified in emergency intervention based upon verified information; and therefore the Washington state legislature hereby provides for the reporting of such cases to the appropriate public authorities.

Former RCW 26.44.010 (1999). Here, the statute evinces that reports are backward looking. The statute declares that chapter 26.44 RCW "provides for the reporting of such cases" that justify emergency intervention. In describing

12

"such cases," the statute utilizes a past tense description of "instances of nonaccidental injury, neglect, death, [and] sexual abuse" that "have occurred," or "instance[s] where a child is deprived of . . . conditions of minimal nurture, health, and safety." Former RCW 26.44.010. It then provides that "as a result of such reports," the department should take efforts to "prevent *further* abuses, and to safeguard the general welfare of such children." Former RCW 26.44.010 (emphasis added). This consistent use of past tense and the term "instances" indicate that the legislature intended the reports to be based on existing conduct, not on future speculation.

For the statute to remain harmonious with constitutional familial rights, it requires existing conduct that has already occurred. *Tyner* emphasized that RCW 26.44.050 has two core purposes: to protect children and to preserve the integrity of the family specifically to protect from unwarranted separation. *Tyner*, 141 Wn.2d at 79. This purpose is consistent with the recognition that parents possess a fundamental liberty and privacy interest in the care, custody, and companionship of their children. *In re Welfare of Sumey*, 94 Wn.2d 757, 762, 621 P.2d 108 (1980). Only where parental actions or decisions conflict with the physical or mental health of the child does the State possess a parens patriae right to intervene.

The right is recognized in chapter 13.34 RCW, which governs the dependency process. The legislature declared that "the family unit is a fundamental

13

resource of American life which should be nurtured. . . . [It] should remain intact unless a child's right to conditions of basic nurture, health, or safety is jeopardized." RCW 13.34.020. Chapter 26.44 RCW also recognizes "[t]he bond between a child and his or her parent, custodian, or guardian is of paramount importance, and any intervention into the life of a child is also an intervention into the life of the parent." Former RCW 26.44.010. A natural parent is the preferred placement for a child who is declared dependent or in shelter care, and the court will defer to a natural parent's placement choice. *See* RCW 13.34.065(5)(a), .260(1).

To balance the integrity of the family and the welfare of children in the context of investigations, we have not recognized a general tort claim of negligent investigation. The negligent investigation claim—limited to the duty to investigate of RCW 26.44.050—is a "narrow exception." *M.W.*, 149 Wn.2d at 601. DSHS would unnecessarily infringe on the integrity of the family if it were directed to investigate a mere prediction that something bad would occur. This would defeat the intentionally narrow confines of the negligent investigation claim.

Wrigley argues that a duty must be invoked here, otherwise children will not be adequately protected from future abuse. We disagree. Requiring existing conduct to trigger the duty to investigate does not necessarily mean that DSHS must wait for the child to be harmed before taking any action. Conduct that

14

"constitute[s] a clear and present danger" to the child's welfare will still trigger the action even where no harm has occurred yet. Former RCW 26.44.020(14). DSHS owes other statutory obligations to protect children within chapter 74.13 RCW (outlining services and duties of DSHS) and chapter 13.34 RCW (outlining dependency, shelter care, and termination of parental rights processes). For example, chapter 74.13 RCW, which is expressly referenced in the statute, includes a provision mandating that DSHS investigate before harm occurs. DSHS has a duty to investigate complaints concerning a caretaker's "recent act or failure to act . . . that presents an imminent risk of serious harm." RCW 74.13.031(3). The complaints specified in RCW 74.13.031(3) require existing conduct—an act or failure to act—to trigger the duty to investigate. It follows then that the duty to investigate of former RCW 26.44.050, which implicates tort liability, also requires an allegation of past or current conduct.

In this case, Wrigley's prediction that A.A. "would be dead within six months" was not a report sufficient to trigger the duty to investigate. It did not allege past or current conduct of abuse or neglect by Viles toward A.A. Until the temporary placement in January 2012, Viles had no contact with A.A. Wrigley's prediction did not allege that Viles engaged in any past or current sexual abuse, sexual exploitation, or injury of a minor child, constituting abuse or neglect as provided in former RCW 26.44.020(1). It also did not identify an act, a failure to

15

act, or a pattern of behavior evidencing a "clear and present danger to a child's health, welfare, or safety," to constitute negligent treatment or maltreatment under former RCW 26.44.020(14). Since DSHS did not receive a report of any past or current conduct indicating abuse or neglect by Viles against A.A., the duty to investigate was not triggered.

## CONCLUSION

We find that DSHS never received a report involving conduct of abuse or neglect of A.A. by Viles. Since no report was received, the duty to investigate was not triggered. Since we find the statutory duty to investigate was never triggered, we do not evaluate the sufficiency of any investigation that DSHS performed.[7] We reverse the Court of Appeals, reinstate the superior court's dismissal of the original

---

[7] Wrigley's legitimate concerns of Viles's prior acts of domestic violence against her cannot alone form the basis of a sufficient report of child abuse or neglect of A.A. under former RCW 26.44.050. *See* former RCW 26.44.020(14). This allegation may be appropriately addressed in a general negligence claim on remand.

16

negligence-based claims, and remand for further proceedings.

WE CONCUR:

Madsen, J.

Owens, J.

Fairhurst, J. PT

Gordon McCloud, J.

*Wrigley v. State*
(Stephens, C.J., concurring)

No. 96830-6

STEPHENS, C.J. (concurring)—Near the end of dependency and placement proceedings, Jessica Wrigley warned the State of Washington that her son, A.A., would be dead within six months if the State sent him to live with his biological father. Despite this report, the State placed the child with the father. A.A. died from physical abuse eight weeks later. Wrigley sued the State based on an alleged violation of the State's duty to investigate under former RCW 26.44.050 (1999). The narrow question before us is whether the direct implied cause of action arising under this statute encompasses Wrigley's claim. I agree with the majority that it does not but for different reasons than the majority offers. Because this statute governs only when the State initiates an investigation into allegations of child abuse or neglect and does not address placement decisions once a child is in the State's protective custody, it is not applicable to the situation presented here. But our decision in this case should go no further than recognizing that the State did not have

a duty to investigate under this particular statute. I agree with the majority that, on remand, Wrigley may be able to show the State had a common law duty to investigate her allegations. Accordingly, I concur.

## FACTUAL BACKGROUND

Wrigley and Anthony Viles met in Idaho in December 2004. Wrigley became pregnant with their son, A.A., a few months later. Viles soon began to abuse Wrigley, first verbally and later physically. Viles dragged Wrigley up a staircase by her hair, threatened to cut off her head, and tried to run her over with his vehicle. Fearing for her safety and that of her unborn child, Wrigley sought and obtained a protection order against Viles in the months before A.A. was born.

A brief review of Viles's history shows Wrigley's fears were well founded. Between 1998 and 2001, Viles was repeatedly held in juvenile detention for assaultive behavior and threats of suicide. During his detention at a psychosocial rehabilitation center in Idaho, Viles had to be physically restrained after assaulting another inmate. Over the years, several members of Viles's family—including his mother, grandfather, and another girlfriend—had called law enforcement to report domestic disturbances involving Viles. Before meeting Wrigley, Viles had pleaded guilty to battery and disturbing the peace in connection with a domestic disturbance.

Wrigley's fears were further substantiated by Viles's behavior after she obtained the protection order. Over the next few years, Viles pleaded guilty to contributing to the delinquency of a minor, was charged with unlawful entry after breaking into an ex-girlfriend's fiancé's property, and threatened to break another relative's neck. This last incident came in December 2011, only one month before the State recommended placing A.A. in Viles's care.

Prior to the State's placement decision, A.A. had never met or lived with Viles. A.A. was living with Wrigley and her husband, Jared Wrigley, when the State initiated dependency proceedings in 2011. There is no dispute that the proceedings were justified by reports of abuse and neglect of A.A. by Wrigley and her husband.

After both A.A. and his younger brother were removed from the Wrigleys' care, the State located Viles, who expressed interest in seeking custody of A.A. The State was aware at that time of Wrigley's concerns about Viles's prior violent behavior. During a family team decision meeting in September 2011, Wrigley had informed case workers that she had a prior restraining order against Viles because of his history of domestic violence and substance abuse issues. Wrigley described how Viles had threatened to cut off her head, had tried to run her over, and had dragged her up a staircase by her hair. Wrigley also described Viles's criminal

history and said Viles had garnered a reputation for violence during his detention at the psychosocial rehabilitation center in the early 2000s.

Noting Wrigley's concerns, the State conducted a series of background checks, criminal history searches, and interviews to determine Viles's fitness as a parent. It determined nothing in Viles's criminal history was disqualifying. Investigators interviewed six character references, all of whom testified Viles was a good father to his biological daughter and his fiancée's children. On this basis, the dependency court allowed A.A. to live with Viles for 30 days, during which social workers and A.A.'s therapist checked in with A.A. multiple times. They found no indication that Viles abused or neglected A.A. during that time.

However, A.A.'s social worker did not believe he had the authority to use available tools that would have resulted in a more thorough background check, which would have alerted the State to Viles's juvenile battery conviction, his history of anger issues, and a parenting assessment completed as part of an unrelated custody dispute. Nor did the social worker conduct follow-up investigations into Viles's behavior that led Wrigley to seek a protection order in 2005. This remained the case even after Wrigley called the social worker to remind him of Viles's history of violence. It was during this call that Wrigley said A.A. would be "dead within six months" if he were sent to live with Viles. Clerk's Papers (CP) at 880.

Despite this stark warning, at the placement hearing, the State highlighted only the positive aspects of A.A.'s potential placement with Viles. In Wrigley's absence, her attorney suggested she was in agreement with dismissing the dependency petition upon A.A.'s placement with Viles. The court explicitly found that placement with Viles was in A.A.'s best interest and dismissed the dependency petition, sending A.A. to live with Viles permanently.

Eight weeks later, A.A. died from his father's physical abuse. Viles was ultimately convicted of manslaughter.

## PROCEDURAL BACKGROUND

Wrigley filed this lawsuit against the State of Washington in 2014, alleging, inter alia, that the State violated its duty to investigate reports concerning the possible occurrence of abuse or neglect by Viles under former RCW 26.44.050. The State answered that it never received a report that triggered its duty under this statute and moved for summary judgment on this ground. The trial court granted partial summary judgment, dismissing most of Wrigley's claims. The trial court then denied Wrigley's motion to amend her complaint to add common law negligence claims and granted the State's second summary judgment motion, dismissing the remainder of Wrigley's claims. The trial court denied Wrigley's motion for reconsideration, so she appealed. The State cross appealed.

A divided panel of the Court of Appeals reversed the trial court's grant of partial summary judgment as to Wrigley's negligence claim under former RCW 26.44.050. The Court of Appeals reasoned that statute imposes a duty on the State to investigate "reports suggesting a reasonable possibility of future abuse or neglect," and determined Wrigley's prediction of A.A.'s death at Viles's hands alerted the State to a "palpable danger" of future abuse more than sufficient to trigger its duty to investigate. *Wrigley v. State*, 5 Wn. App. 2d 909, 929, 931, 428 P.3d 1279 (2018). In an unpublished portion of the opinion, the Court of Appeals also held the trial court abused its discretion when it denied Wrigley's motion to amend her complaint. The Court of Appeals remanded and directed the trial court to allow Wrigley to amend her complaint to add a number of claims, including alternative theories of negligence arising from the State's common law duties.

The State appealed, challenging only the holding that Wrigley's prediction of A.A.'s death constituted a "report concerning the possible occurrence of child abuse or neglect" triggering its duty to investigate under former RCW 26.44.050. Pet. for Review at 12. We granted review. *Wrigley v. State*, 193 Wn.2d 1008 (2019).

## ANALYSIS

The sole question in this case is whether Wrigley can sue the State for negligent investigation under former RCW 26.44.050. Wrigley argues her warning

-6-

to the State, including that A.A. would be "dead within six months" if he were sent to live with Viles, CP at 880, constituted a report concerning the possible occurrence of abuse and neglect triggering the State's statutory duty to investigate, and that the State breached this duty by placing A.A. with Viles. The State counters that Wrigley's warning did not trigger its duty to investigate because former RCW 26.44.050 does not include a duty to investigate allegations of future abuse made in the course of ongoing dependency and placement proceedings.

Like the majority, I ultimately agree that the State owed Wrigley no duty under former RCW 26.44.050. But unlike the majority, I would not rely on other provisions within chapter 26.44 RCW to conclude Wrigley cannot succeed in her claim because her warning did not involve allegations of past abuse. Instead, I would hold that Wrigley's claims do not fall within the scope of the statute's implied cause of action because former RCW 26.44.050 does not concern placement decisions during an ongoing dependency matter. I would not otherwise opine about allegations of past versus possible future abuse, as there may be other situations in which allegations of potential abuse are sufficient to trigger the State's duty to investigate under RCW 26.44.050. I see no reason to preemptively foreclose such claims here.

A.  Wrigley Did Not State a Cognizable Claim within the Implied Cause of Action We Have Recognized under Former RCW 26.44.050 Because the State's Investigation Was Not Governed by That Statute

Whether Wrigley can sue the State under former RCW 26.44.050 presents a question of statutory interpretation, which is a question of law we review de novo. *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002).  To determine the statute's plain meaning, we look to "the ordinary meaning of the language at issue, the context of the statute in which [the relevant] provision is found, related provisions, and the statutory scheme as a whole." *State v. Engel*, 166 Wn.2d 572, 578, 210 P.3d 1007 (2009) (citing *State v. Jacobs*, 154 Wn.2d 596, 600-01, 115 P.3d 281 (2005)).

Former RCW 26.44.050 provides that

Upon the receipt of a report concerning the possible occurrence of abuse or neglect, the law enforcement agency or the department of social and health services must investigate and provide the protective services section with a report in accordance with chapter 74.13 RCW, and where necessary to refer such report to the court.

A law enforcement officer may take, or cause to be taken, a child into custody without a court order if there is probable cause to believe that the child is abused or neglected and that the child would be injured or could not be taken into custody if it were necessary to first obtain a court order pursuant to RCW 13.34.050. The law enforcement agency or the department of social and health services investigating such a report is hereby authorized to photograph such a child for the purpose of providing documentary evidence of the physical condition of the child.

This statute imposes on the State a duty to investigate allegations of child abuse but does not provide an explicit remedy if the State breaches that duty. Recognizing that "'a legislative enactment may be the foundation of a right of action'" even when that right of action is not explicit in the legislative text, we have determined that former RCW 26.44.050 implies a cause of action for claims of negligent investigation against the State. *Tyner v. Dep't of Soc. & Health Servs.*, 141 Wn.2d 68, 77, 1 P.3d 1148 (2000) (internal quotation marks omitted) (quoting *Bennett v. Hardy*, 113 Wn.2d 912, 919, 784 P.2d 1258 (1990)); *see also M.W. v. Dep't of Soc. & Health Servs.*, 149 Wn.2d 589, 602, 70 P.3d 954 (2003) (recognizing cause of action where the State gathered incomplete or biased information that resulted in a harmful placement decision, such as allowing a child to remain in an abusive home, placing a child in an abusive home, or removing a child from a nonabusive home).

However, this cause of action is not a remedy for every harm caused by the State. *See M.W.*, 149 Wn.2d at 598 ("Because the cause of action of negligent investigation originates from the statute, it is necessarily limited to remedying the injuries the statute was meant to address."). We have repeatedly declined to expand the implied cause of action under former RCW 26.44.050 to other parties or other harms that arise as a result of the State's investigation. *See Ducote v. Dep't of Soc. & Health Servs.*, 167 Wn.2d 697, 706, 222 P.3d 785 (2009) (rejecting stepparents'

negligent investigation claims under RCW 26.44.050 because the class of persons protected by the statute includes only children, parents, or guardians of children); *M.W.*, 149 Wn.2d at 601 (rejecting minor's negligent investigation claims under RCW 26.44.050 where the alleged harm was not a harmful placement decision); *Roberson v. Perez*, 156 Wn.2d 33, 46-48, 123 P.3d 844 (2005) (rejecting negligent investigation claims under RCW 26.44.050 to include harms caused by "'constructive placement' decisions"). Today, I would decline to extend the implied cause of action under former RCW 26.44.050 to include another type of investigation—namely, the State's investigation into whether living with Viles would be a suitable placement for A.A. after he was removed from Wrigley's care. This circumstance simply falls outside the scope of the statute.

To understand why, it is important to consider former RCW 26.44.050 within the context of Washington's comprehensive child welfare "statutory scheme as a whole." *Engel*, 166 Wn.2d at 578.

The legislature first provided for child welfare services in 1965. *See* LAWS OF 1965, ch. 30, § 2 ("The purpose of this chapter is to safeguard, protect and contribute to the welfare of the children of the state, through a comprehensive and coordinated program of public child welfare services."). In the 50 years since, the legislature has updated and expanded Washington's "comprehensive statutory framework"

governing Washington's child welfare system. *H.B.H. v. State*, 192 Wn.2d 154, 164, 429 P.3d 484 (2018) (citing chs. 13.34 RCW (dependency and termination of parent-child relationship), 26.44 RCW (abuse of children), 74.13 RCW (child welfare services), 74.15 RCW (care of children, expectant mothers, persons with developmental disabilities)). "Balancing the interests of parents, children, and the State," Washington's child welfare laws recognize that "while parents have a fundamental liberty interest in the care and custody of their children, the State has an equally compelling parens patriae interest in protecting the physical, mental, and emotional health of children in this state." *H.B.H.*, 192 Wn.2d at 163-64 (citing *In re Dependency of Schermer*, 161 Wn.2d 927, 941, 169 P.3d 452 (2007)). The central purpose of Washington's statutory scheme is "to safeguard, protect, and contribute to the welfare of the children of the state." RCW 74.13.010. To this end, when a parent's actions "seriously conflict with the physical or mental health of the child," the State has both a "right and responsibility to intervene to protect the child" by removing them from their parent's custody. *In re Welfare of Sumey*, 94 Wn.2d 757, 762, 621 P.2d 108 (1980).

An essential part of Washington's "detailed statutory scheme authorizes the State to remove a child from the family home, take the child into state custody, and declare the child 'dependent' when doing so is in the best interest and safety of the

child." *H.B.H.*, 192 Wn.2d at 164-65 (footnote omitted) (citing RCW 26.44.010; *Schermer*, 161 Wn.2d at 942). These dependency proceedings are initiated when the State receives a report regarding the possible occurrence of child abuse or neglect, which triggers the State's duty to investigate such allegations under former RCW 26.44.050. *See H.B.H.,* 192 Wn.2d at 165 ("The dependency process is initiated when DSHS [Department of Social and Health Services] receives a report that a child has been abused, neglected, or abandoned." (citing RCW 26.44.050)). "Upon receiving the report, DSHS assigns a social worker to investigate the allegations[ and i]f there appears to be merit to the allegations of abuse and the child is in immediate danger, the social worker may file a dependency petition with the juvenile court to remove the child from the family home." *Id.* (citing RCW 13.34.040(1)).

Once a child has been taken into custody pursuant to former RCW 26.44.050, the State must make reasonable efforts to inform the child's parents of its decision and rationale. RCW 13.34.062. Within 72 hours, the juvenile court must hold a shelter care hearing to determine whether the child can be safely returned home while the dependency process is ongoing or whether the child should be placed elsewhere. RCW 13.34.065(1). Washington law requires the State to release a child alleged to be dependent into the care of a parent, guardian, or legal custodian, unless

such release would present a threat of substantial harm to the child. RCW 13.34.065(5)(a)(ii)(B). While the child is safely in shelter care, the State and the juvenile court work to determine where the child should be permanently placed. *See* RCW 13.34.130. When the State initiates a dependency proceeding after an investigation under former RCW 26.44.050, it is a party to the proceeding and owes a duty of candor to the court. As such, the State has a responsibility to fully and accurately inform the court of evidence it uncovers when evaluating the suitability of potential placements.

The State's duty to evaluate the suitability of a potential placement is separate and distinct from the State's duty to investigate allegations of child abuse under former RCW 26.44.050. These duties arise in different contexts and at different times during the dependency process. The State's duty to investigate under former RCW 26.44.050 triggers the State's intervention into an allegedly abusive family unit and so necessarily precedes the placement decision process. The duty to investigate under former RCW 26.44.050 cannot arise within the dependency and placement process itself. Rather, once the State has investigated a report under former RCW 26.44.050 and concluded the child should be removed and placed elsewhere, its investigation into potential placement options must be conducted

pursuant to RCW 13.34.065 and other portions of Washington's comprehensive child welfare laws, and consistent with ordinary standards of care.

Here, the State's investigation into Viles as a suitable parent to take custody of A.A. was conducted pursuant to duties other than those prescribed by former RCW 26.44.050. In its briefing at summary judgment, the State suggested that RCW 13.34.065 might be applicable. *See* CP at 50 ("At most, [the investigation into Viles] might be seen as an investigation under RCW 13.34.065(5) . . . ."). However, it was Jessica and Jared Wrigley who were the subjects of investigation under former RCW 26.44.050 when the State initially received reports of suspected abuse and neglect. Wrigley's warnings about Viles came during ongoing shelter care and placement proceedings, and concerned the risks of a particular placement for A.A., not a report triggering the State's duties under former RCW 26.44.050.

Consequently, I would hold that the implied cause of action we have recognized under former RCW 26.44.050 does not encompass Wrigley's claim of negligent investigation based on warnings she gave as to placing A.A. with Viles. *See M.W.*, 149 Wn.2d at 598 ("Because the cause of action of negligent investigation originates from the statute, it is necessarily limited to remedying the injuries the statute was meant to address."). That holding fully resolves this appeal, and we should say no more.

B.  The Majority Errs by Answering a Question We Should Not Reach

Today's majority goes beyond interpreting former RCW 26.44.050 and opines that no allegation of future abuse or neglect—regardless how serious or certain such allegation may be—is sufficient to trigger the State's duty to investigate.  There is no need to announce so categorical a proposition, and the majority goes too far by foreclosing a potentially valid cause of action under this or related statutes.

There may well be cases in which allegations of future abuse are sufficient to trigger the State's duty under former RCW 26.44.050.  Imagine a child telling her teacher that her father would beat her that night because she failed her spelling test.  That teacher is a mandatory reporter under RCW 26.44.030, and it stands to reason that a report of such an imminent threat of abuse may well trigger the State's duty to investigate under RCW 26.44.050. I cannot agree with the majority's suggestion that the State would have no obligation to initiate proceedings to protect a child under these circumstances.  We should decide that question when it is squarely before us, and not before.

I recognize that the State asserts the argument the majority relies on in rejecting Wrigley's statutory claim.  It focuses on the past tense verbiage in the statute to argue that the State's duty to investigate can never be triggered unless the alleged abuse has actually occurred.  *See* majority at 13.  In my view, this reading of

-15-

the statute elevates form over substance; we must read the statute in consideration of its purpose, and not wooden rules of grammar. Moreover, use of the past tense in this context does not denote that abuse must have already occurred. A more natural reading is that it speaks to the State's duty when it receives any report of abuse or neglect. Such reports will certainly involve a wide range of circumstances. We should not artificially constrict the statute's reach, especially when this is entirely unnecessary to resolving the present appeal.

## CONCLUSION

Because former RCW 26.44.050 governs when the State initiates an investigation into allegations of child abuse or neglect and does not address placement decisions once a child is in the State's protective custody, I would hold Wrigley's warnings about Viles were not a "report" under that statute and therefore cannot support a claim under its implied right of action. I concur because this conclusion is logically prior to the question of whether allegations of future abuse or neglect may trigger the State's duty to investigate under former RCW 26.44.050, and so I would not answer that question today. But I agree with the majority on one essential point: today's decision does not disturb the unpublished portion of the Court of Appeals decision directing the trial court to allow Wrigley to amend her

complaint to add alternative claims and theories of liability, including statutory and

common law negligence claims.

Stephens, C.J.

González, J.

Yu, J.

Wiggins, J.