IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| L.G., a minor; L.G., a minor; RANDY GIBSON, individually and as guardian in fact of L.G. and L.G.,<br><br>        Appellants,<br><br>        v.<br><br>WASHINGTON STATE DEPARTMENT OF CHILD, YOUTH, AND FAMILIES, a Washington State government agency, and the STATE OF WASHINGTON,<br><br>        Respondents. | No. 86098-4-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

DíAZ, J. — Randy Gibson, individually and as guardian of his minor children, L.N.G. and L.L.G.,[1] sued the Washington State Department of Children, Youth, and Families (DCYF), claiming it negligently investigated allegations of abuse of the children by their mother. The court dismissed his suit on summary judgment. We affirm.

## I.    BACKGROUND

Between 2017 and 2020, various people contacted DCYF at least 10 times

---

[1] For clarity, we only refer to the father as Gibson. We refer to the children by their initials to protect their anonymity.

with concerns about the safety of the two children, L.N.G. and L.L.G. Their parents lived separately and the reported incidents occurred at both homes. DCYF never sought a shelter hearing or instigated removal of the children. We summarize each relevant DCYF referral chronologically below.[2]

    1. April 2017 and September 2018

In April 2017, Gibson reported to DCYF that the children's mother was giving them medicine "to knock them out at night," although the referral did not specify what type of medicine. He also stated that L.N.G. was afraid to go to her mother's home because her mother had threatened to "whip [her] butt and cut her hair off." L.N.G. also said that her mother had slapped her face. He did not report any marks or bruises. DCYF "screened out" the referral without investigating, noting in the intake report that there was "[n]o specific [child abuse or neglect] allegation or risk."

---

[2] The clerk's papers indicate that DCYF received other referrals not discussed in this opinion, some of which occurred before 2017. In his opening brief, Gibson points to five DCYF responses between 2017 and 2020 in support of their negligent investigation claim. At oral argument, Gibson claimed that there were at least six relevant incidents. Wash. Ct. of Appeals oral argument, L.G.v. Dep't of Child., Youth & Fams., No. 86098-4-I (Mar. 5, 2026), at 3 min., 30 sec. through 3 min., 55 sec. video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2026031191/?eventID=2026031191. It is possible that Gibson is referring to two separate incidents in August 2018 that were reported in the same referral. Gibson may also be referring to a referral in April 2017 which alleged sexual abuse of L.L.G. while he was in Gibson's care, since the expert declaration stated that DCYF's response did not meet the standard of care. However, Gibson does not argue that DCYF was negligent in the April 2017 response to the sexual abuse allegation. We limit the scope of our review to the DCYF responses substantively argued by Gibson in the briefing. Clark County v. W. Wash. Growth Mgmt. Hrg's Bd., 177 Wn.2d 136, 144, 298 P.3d 704 (2013) ("The scope of a given appeal is determined by the notice of appeal, the assignments of error, and the substantive argumentation of the parties.").

In August 2018, Gibson contacted DCYF to inform them that the mother's twelve-year-old nephew had allegedly sexually assaulted the children and tried to drown them, but that their mother was still allowing the nephew unsupervised contact with the children. DCYF investigated and concluded that the allegations were unfounded.

2. October 2018 and February 2020

In October 2018, both Gibson and the Seattle Police Department (SPD) contacted DCYF to inform them that L.N.G. had a black eye and that she said her maternal aunt had picked her up by the neck and thrown her down. DCYF initiated a "family assessment response." After speaking with the mother and with L.N.G. herself, DCYF closed the case.

In January 2020, a school counselor informed DCYF that L.N.G. had disclosed that her mother told her to "get naked and get out of the house." The counselor did not have any additional details and could not specify a time other than "sometime last year." DCYF "screened out" the referral due to no specific allegation of child abuse or neglect.

In February 2020, a school nurse, a hospital social worker, and a police officer reported to DCYF that L.N.G. had a chipped tooth and that she had disclosed that her mother had punched her several times. DCYF investigated and then closed the case in March 2020, finding there was no longer any present danger to the children because a superior court had ordered that the children were to reside full-time with Gibson.

3. Family Court Procedural History

Before the court entered a parenting plan, the children alternated weeks between Gibson's house and their mother's house. A final parenting plan entered in July 2018 ordered that the children reside with their mother and allowed Gibson visitation. As referenced above, in February 2020, the children began living with Gibson, and Gibson petitioned to change the parenting plan. In April 2020, the court found adequate cause to change the parenting plan while the case was pending.

The court held a two-day trial on March 1-2, 2021. The court found that, in their mother's home, the children experienced "physical and emotional harm inflicted upon them on a consistent basis." The court therefore entered a final parenting plan, ordering that the children should reside primarily with Gibson and that their contact with their mother should be supervised.

4. Tort Claim

In March 2022, Gibson sued DCYF, claiming both negligent investigation and general negligence. DCYF moved for summary judgment. In response, Gibson filed a declaration from Barbara Stone, a social worker with several years' experience with children and family services in Washington. She had reviewed DCYF's reports and declared that several of its responses did not meet the standard of care. Following a hearing, the court granted summary judgment and dismissed both of Gibson's claims.

II. ANALYSIS

On appeal, Gibson assigns error only to the dismissal of the negligent investigation claim. Wash. Ct. of Appeals oral argument, L.G. v. Dep't of Youth,

Child., & Fams., No. 86098-4-I (Mar. 5, 2026), at 2 min., 4 sec. through 2 min., 16 sec. video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2026031191/?eventID=2026031191. Specifically, Gibson claims that he "presented a plethora of facts that raise genuine issues of material fact" on that claim. We disagree.

We review summary judgment orders de novo, while "view[ing] all facts and reasonable inferences in the light most favorable to the nonmoving party." TracFone, Inc. v. City of Renton, 30 Wn. App. 2d 870, 875, 547 P.3d 902 (2024). Washington courts employ a two-step burden-shifting analysis for summary judgment motions. Id. First, the "party moving for summary judgment bears the initial burden of showing that there is no disputed issue of material fact." Haley v. Amazon.com Servs., LLC, 25 Wn. App. 2d 207, 216, 522 P.3d 80 (2022). Second, the "burden then shifts to the nonmoving party to present evidence that an issue of material fact remains." Id. "Put another way, summary judgment 'should be granted only if, from all the evidence, a reasonable person could reach only one conclusion.'" Welch v. Brand Insulations, Inc., 27 Wn. App. 2d 110, 114, 531 P.3d 265 (2023) (quoting Folsom v. Burger King, 135 Wn.2d 658, 663, 958 P.2d 301 (1998)).

DCYF's concomitant duties to protect children, respect the rights of parents, and preserve families "are often in tension with each other." Atkerson v. Dep't of Child., Youth, & Fams., 4 Wn.3d 307, 314, 562 P.3d 1256 (2025). The legislature enacted a statutory framework "aimed at limiting the harm to families from State

intervention while not chilling social workers from intervening when necessary to protect the child." Id. at 310.

When DCYF receives a report of child abuse or neglect, it has a duty to investigate. RCW 26.44.050(1). DCYF may "screen out" a report if the allegation "does not rise to the level of a credible report of abuse or neglect." RCW 26.44.020(26). If the allegation rises to the level that triggers a duty to investigate, the legislature has given DCYF discretion to respond with either a traditional investigation or a family assessment. RCW 26.44.030(12)(a).

If there is probable cause to believe that a child should be removed from their home "to prevent imminent physical harm to the child due to child abuse or neglect," DCYF may remove the child without a court order. RCW 26.44.050. A shelter care hearing, at which the court determines whether the child should be returned to the family home, should be held within 72 hours, excluding weekends and holidays. RCW 13.34.065(1)(a). Any investigation that occurs prior to a shelter care hearing, including investigations that never lead to removal, are "emergent placement investigations." Atkerson, 4 Wn.3d at 315-17.

Of the DCYF responses that Gibson argues were negligent, none of them led to a shelter care hearing, meaning that all the responses were emergent placement investigations. Id. One was conducted as a family assessment, two as traditional investigations, and two as screened-out reports. We review each response in turn.

A.    Family Assessment

Gibson argues that there is a genuine issue of material fact as to whether

DCYF was negligent when in October 2018, it responded with a family assessment to the allegations that L.N.G.'s aunt had thrown her by her neck and that L.N.G. had a black eye. We disagree.

A family assessment is "a comprehensive assessment of child safety, risk of subsequent child abuse or neglect, and family strengths and needs." RCW 26.44.020(12). A family assessment "does not include a determination as to whether child abuse or neglect occurred, but does determine the need for services to address the safety of the child and the risk of subsequent maltreatment." Id.

DCYF may only be held civilly liable for responding with a family assessment if "the state or its officers, agents, or employees acted with reckless disregard." RCW 26.44.030(12)(d). Reckless disregard is when someone acts despite either knowing or having reason to know that their conduct creates "a high degree of probability that substantial harm will result" for someone else.[3] Brown v. Dep't of Soc. & Health Servs., 190 Wn. App. 572, 590, 360 P.3d 875 (2015).

Gibson did not plead reckless disregard in his initial complaint. Nor does he argue, either in his opening brief or response to the motion for summary judgment, that DCYF showed reckless disregard. Instead, Gibson points to a DCYF policy that states that family assessments are for "lower risk allegations of child maltreatment" and to Stone's declaration stating that "[a]n 8-year-old child with a black eye who reports being picked up by her neck is not a low-risk

---

[3] To our knowledge, no appellate court in Washington has reviewed a claim that an investigating department or agency showed reckless disregard in responding with a family assessment instead of a traditional investigation. We therefore apply the legal definition from similar fact patterns by analogy to determine whether Gibson presents evidence of reckless disregard.

7

allegation." Even assuming Stone's declaration is true, a violation of policy alone is not evidence of reckless disregard. See Petcu v. State, 121 Wn. App. 36, 59, 86 P.3d 1234 (2004) (holding that a deviation from the standard of care or failure to follow proper procedures is insufficient for a claim of negligent investigation).

The uncontested facts show that L.N.G. said the black eye was caused by her cousin "trying to hit her with a pillow." L.N.G. also reported that she was able to breathe when her aunt lifted her up and that she was not hurt when her aunt threw her down. DCYF spoke with the mother following the referral, and the mother clarified that the aunt had lifted L.N.G. using her coat to pull her away from roughly playing with her sister. Even viewing the evidence in the light most favorable to Gibson, the evidence does not give DCYF a reason to know that responding with a family assessment and then closing the case would result in a high probability of substantial harm to the children. See, e.g., Brown, 190 Wn. App. at 594 (holding that a mother who did not immediately seek medical care for her child who was burned with hot water did not show reckless disregard). Gibson's claim of negligent investigation regarding the October 2018 allegation therefore fails since they do not present evidence that DCYF showed reckless disregard.

B.    Investigations

Gibson next argues that there is a genuine issue of material fact as to whether DCYF negligently investigated the August 2018 and February 2020 referrals. We again disagree.

To prevail on a claim for negligent investigation, a parent must prove both

that DCYF conducted an "incomplete or biased" investigation and that the failure was a proximate cause of the child being placed in a "harmful placement decision, such as . . . letting a child remain in an abusive home." Atkerson, 4 Wn.3d at 314 (internal quotation marks omitted) (quoting Desmet v. Dep't of Soc. & Health Servs., 200 Wn.2d 145, 160, 514 P.3d 1217 (2022)). It is not enough to show that DCYF failed to "follow proper investigative procedures" or that the investigations fell below a standard of care. Petcu, 121 Wn. App. at 59.

The legislature has further limited DCYF's liability when conducting an emergent placement investigation. Atkerson, 4 Wn.3d at 310. A parent may only prevail if they show that the "determination to leave a child with a parent" constituted *gross* negligence. Id. at 316-17 (quoting RCW 4.24.595(1)). "'To survive summary judgment in a gross negligence case, a plaintiff must provide substantial evidence of serious negligence.'" Peterhans v. Univ. of Wash., 34 Wn. App. 2d 745, 753, 571 P.3d 322 (2025) (emphasis omitted) (quoting Harper v. Dep't of Corr., 192 Wn.2d 328, 345-46, 429 P.3d 1071 (2018)).[4]

Since DCYF's investigations in this case are all "emergent placement investigations," DCYF is protected from liability by RCW 4.24.595(1) unless Gibson can show gross negligence. Atkerson, 4 Wn.3d at 315-17. Gibson bears the

---

[4] The court in Atkerson recited an alternative definition of "gross negligence," which is "the failure to exercise slight care." 4 Wn.3d at 311-12 (quoting Nist v. Tudor, 67 Wn.2d 322, 324, 407 P.2d 798 (1965)). Our courts have "expanded on" and this "frequently expressed statement," noting that it "does not mean 'the total absence of care but care substantially or appreciably less than the quantum of care inhering in ordinary negligence.'" Peterhans, 34 Wn. App. 2d at 752-53 (quoting Harper, 192 Wn.2d at 342, and Nist, 67 Wn.2d at 331).

burden to show that DCYF acted with gross negligence. Id. at 312.

As to the August 2018 investigation into the claim that the mother's nephew had sexually assaulted and tried to drown the children, Gibson does not present substantial evidence of seriously negligent acts or omissions. The DCYF social worker spoke with both parents, both maternal grandparents, a maternal aunt, and both children. When the social worker asked, both children denied any sexual assault. The social worker spoke with the grandfather, who was present for the alleged drowning incident, and who explained that the children were playing safely and that lifeguards were present.

In response, Gibson relies greatly on Stone's declaration, which states only that the August 2018 investigation, was "incomplete and does not follow standard of care." No reasonable person could find, based upon such testimony—even viewing the evidence in the light most favorable to Gibson—that DCYF committed seriously negligent acts or omissions in its investigations. See Welch, 27 Wn. App. 2d at 114. The record is unclear how the investigation was incomplete, let alone seriously incomplete. In turn, Gibson may not prevail on a negligent investigation claim for the August 2018 referral.

As to the February 2020 referral, in which L.N.G. disclosed that her mother had punched her several times, DCYF originally initiated a family assessment response, but exercised its discretion under RCW 26.44.030(12)(b)(ii) to conduct an investigation following the corroborating referral and additional information from the school nurse. DCYF spoke with the mother, father, maternal grandmother, and both children. The social worker informed the mother that force or physical

10

discipline should not be used going forward.

Stone again states that the investigation did not meet the standard of care because the worker does not consult with family court, and because DCYF closed the case when family court gave the father custody of the children. But Stone does not testify, and Gibson does not provide any further evidence, that these alleged omissions were a proximate cause of the child being placed in a "harmful placement decision, such as . . . letting a child remain in an abusive home." Atkerson, 4 Wn.3d at 314. Thus, again, Gibson presents no issue of material fact as to the negligent investigation claim for the February 2020 referral.

C.    Screened-Out Reports

Gibson finally claims that there is a genuine issue of material fact as to whether DCYF was negligent when it screened out the referrals regarding the April 2017 and January 2020 incidents. We again disagree.

Specifically, Gibson argues that the allegations triggered DCYF's duty to investigate, which DCYF failed to do when it "screened out" the referrals. DCYF responds that its duty to investigate was not triggered by the referrals since the information did not meet the definition of abuse or neglect. DCYF is correct.

On a negligence claim, summary judgment is proper if the plaintiff fails to prove the essential element of duty. Martini v. Post, 178 Wn. App. 153, 164, 313 P.3d 473 (2013) ("The plaintiff must establish an issue of material fact as to each element of negligence to defeat summary judgment.") Gibson bears the burden to show that DCYF had a duty to investigate. H.B.H. v. State, 192 Wn.2d 154, 168, 429 P.3d 484 (2018).

11

A report triggers DCYF's duty to investigate only when it alleges abuse or neglect. Wrigley v. Dep't of Soc. & Health Servs., 195 Wn.2d 65, 71, 455 P.3d 1138 (2020) (citing former RCW 26.44.050 (2018)). Not all reports to DCYF involve abuse or neglect. Wrigley, 195 Wn.2d at 73. To trigger a duty, the report must specifically allege "past or current sexual abuse, sexual exploitation, or injury of a minor child" or a "clear and present danger to a child's health, welfare, or safety" to constitute negligent treatment or maltreatment. Id. at 77 (quoting former RCW 26.44.020(1) (2018)).

The April 2017 report alleged that the mother gave the children medicine "to knock them out at night," but it is unclear what medicine and where the mother got it. The vague information does not specifically allege any abuse, exploitation, injury, or a clear and present danger to the children sufficient to trigger a duty to investigate. See Wrigley, 195 Wn.2d at 77 (holding that the report that a child "would be dead within six months" did not trigger the duty to investigate since it "did not allege past or current conduct of abuse or neglect").

The allegations that the mother had slapped L.N.G.'s face and threatened to "whip [her] butt" also do not allege abuse, exploitation, injury, or a clear and present danger to the children sufficient to trigger a duty to investigate. See RCW 9A.16.100(1) ("the physical discipline of a child is not unlawful when it is reasonable and moderate and is inflicted by a parent or guardian for purposes of restraining or correcting the child"). Even with Stone's declaration that the threats to cut L.N.G.'s hair "were meant to cause emotional pain," there is not a genuine issue of material fact as to whether the allegations constitute abuse, exploitation,

12

injury, or a clear and present danger to the children. Without such evidence, DCYF did not have a duty to investigate.

As to the January 2020 allegation that L.N.G.'s mother told her to "get naked and get out of the house," there is virtually no specificity nor any further explanation of whether L.N.G. was actually forced outside naked. Stone's conclusory statement, "[t]hese allegations come clearly under the neglect statute," is not evidence that the allegation described specific abuse or neglect. There is no clear and present danger to L.N.G., who stated that she was not living with her mother at the time of the referral. No reasonable person would conclude that the referral triggered DCYF's duty to investigate. See Welch, 27 Wn. App. 2d at 114.

Even if we were to hold that, viewing the evidence in the light most favorable to Gibson, DCYF's duty to investigate was triggered, DCYF is still protected from liability under RCW 4.24.595(1). The initial screening is part of the emergent placement investigation, meaning Gibson must show gross negligence to prevail. See, e.g., Atkerson, 4 Wn.3d at 316 ("RCW 4.24.595 does not apply only to acts or omissions that result in shelter care hearings. It also applies to 'any determination to leave a child with a parent . . . or to return a child to a parent.'") (alteration in original) (quoting RCW 4.24.595(1)).

As to the April 2017 referral, DCYF had already initiated a family assessment response following a different referral in April 2017. Gibson reported the same allegations listed above to the social worker conducting the family assessment. The social worker spoke with both parents and both children as part of the family assessment. The children did not disclose anything concerning to the

social worker.  The social worker identified no other safety threats and closed the case in June 2017.  Stone responds summarily that "the failure to investigate this report is a breach" and the intake "does not meet standard of care."  But Gibson cannot show that the family assessment response in the following months was such a substantial departure from the standard of care as to show that DCYF was grossly negligent.

As to the January 2020 referral, Gibson has not provided substantial evidence of serious negligence when DCYF assessed the allegation.  The intake report describes household composition, the custody situation, additional risk factors, and a history of child abuse and neglect allegations.  Although Stone states that the response "is a breach of the mandated requirements for DCYF" and "does not meet standard of care," Gibson does not meet their burden to provide substantial evidence of *serious* negligence as required to avoid summary judgment on this issue.

Finally, Gibson argues that multiple breaches of the standard of care may equate to gross negligence. Wash. Ct. of Appeals oral argument, supra at 21 min., 50 sec. through 22 min., 15 sec.  And he submits that Stone provides the factual basis to create a genuine issue of material fact.  In support, Gibson points to Heideman v. Chelan County, ex rel. Chelan County Sheriff's Office, in which the court noted expert testimony stating that a high number of referrals should alert investigators of a greater risk of harm to the children.  No. 33093-1-III, slip op. at 27 (Wash. Ct. App. Jun. 14, 2016) (unpublished), https://www.courts.wa.gov/opinions/pdf/330931.amd.pdf.

14

But Heideman, which was published nine years before Atkerson clarified that RCW 4.24.595 shields DCYF from liability in emergent placement investigations, does not address whether the several referrals warrant a higher standard of care or otherwise serve as evidence of gross negligence. Heideman does not support Gibson's argument that multiple instances of alleged negligence—each of which is insufficient to establish gross negligence—can somehow cumulatively establish gross negligence. Indeed, if the argument were accepted, it would allow plaintiffs to circumvent the clear statutory requirement that there be gross negligence and would upset the balance the legislature has established, aimed at "limiting the harm to families from State intervention while not chilling social workers from intervening when necessary to protect the child." Atkerson, 4 Wn.3d at 310.

Although Gibson's expert witness stated that the many reports showed "an ongoing story of a family disruption with real consequences for the children" and that DCYF failed several times to meet the standard of care, she does not state that DCYF substantially departed from the standard of care at any time. In our review of the evidence presented, we hold that no reasonable person could find such a substantial departure from the standard of care as to constitute gross negligence. See Welch, 27 Wn. App. 2d at 114. Therefore, summary judgment dismissal was proper.[5]

---

[5] Because we uphold the dismissal based on Gibson's failure to present evidence of gross negligence or reckless disregard, we need not reach the issue of whether the negligent investigation was a proximate cause of the children being left in an abusive home.

## III.    CONCLUSION

We affirm the trial court's order.

_Díaz, J._

WE CONCUR:

_Feldman, J._                              _____, ACJ_